# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 13, 2012

Lyle W. Cayce
Clerk

No. 10-51113

TIME WARNER CABLE INC.; TEXAS CABLE ASSOCIATION,

Plaintiffs - Appellants,

v.

PAUL HUDSON, in His Official Capacity as Chairman of the Public Utility Commission of Texas; JULIE PARSLEY, in Her Official Capacity as Commissioner of the Public Utility Commission of Texas; BARRY SMITHERMAN, in His Official Capacity as Commissioner of the Public Utility Commission of Texas,

Defendants - Appellees,

TCCFUI, Texas Coalition of Cities for Utility Issues; GTE SOUTHWEST INC., doing business as Verizon Southwest; SOUTHWESTERN BELL TELEPHONE L.P., doing business as SBC Texas; GRANDE COMMUNICATIONS NETWORKS, INC.,

Intervenor Defendants - Appellees.

Appeal from the United States District Court
for the Western District of Texas

Before REAVLEY, ELROD, and GRAVES, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

Time Warner Cable and Texas Cable Association appeal the district court's grant of summary judgment that dismissed their claims that a Texas statute violates the First and Fourteenth Amendments of the Constitution or is

preempted by federal law. Because the statute unjustifiably discriminates against a small number of incumbent cable providers in violation of the First Amendment, we REVERSE.

## I.

## A.

A cable provider relies on public rights-of-way and easements to build cable networks and provide video programming services to a municipality's residents. "As a result, the cable medium may depend for its very existence upon express permission from local governing authorities." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 628 (1994). Historically, cable providers in Texas obtained that local government permission by negotiating long-term franchise agreements with each municipality. In return for the necessary access to public rights-of-way, municipalities imposed franchise fees and subjected cable operators to extensive regulation, such as requiring that they carry public-access channels and "build-out," or lay cable in, all of the municipal franchise area.

Beginning in 1984, Congress introduced additional federal regulation to these franchise agreements. For example, federal law requires that the franchising authority "[i]n awarding a franchise . . . shall assure that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides," a practice known as red-lining. 47 U.S.C. § 541(a)(3).

Many Texas municipalities have traditionally received cable services entirely from a single "incumbent" cable operator, often the operator that first installed a cable network for that community. *See Tex. Cable & Telecomms. Ass'n v. Hudson*, 265 F. App'x 210, 212 (5th Cir. 2008). However, incumbent operators began to face competition from overbuilders[1] and telephone companies

---

[1] "Overbuilder" is a term in the industry for companies that build their own cable systems in areas already served by a cable operator. The term does not refer to what the cable market can bear.

entering the video services market.[2] *Id.* Nevertheless, the cost of negotiating separate franchise agreements with each targeted municipality across the state hindered the ability of new entrants to compete.

In response to this barrier to entry, the Texas legislature enacted Senate Bill 5 (S.B. 5), an "Act Relating to Furthering Competition in the Communications Industry," aimed at reforming the cable service industry in Texas. S.B. 5 creates a new state-level franchising system that obligates the Public Utility Commission (PUC) to grant a franchise for the requested areas if the applicant satisfies basic requirements. *See* Tex. Util. Code § 66.003. New entrants, like the telephone companies, may obtain a single statewide franchise that avoids the expense and inconvenience of separate municipal franchise agreements across the state. Overbuilders may terminate their existing municipal franchise agreements in favor of the convenience of the statewide franchise. § 66.004(b).[3] Incumbent cable providers, on the other hand, cannot similarly opt out for the statewide franchise, until after the expiration of the municipal license. § 66.004(a).[4]

## B.

The day after S.B. 5 was signed into law, Texas Cable Association (TCA), a trade organization representing incumbent cable operators in Texas, filed suit against each of the PUC's commissioners. TCA alleged that S.B. 5 violates the

---

[2] Federal law once banned telephone companies from providing cable services, but Congress repealed that ban in 1996. *See* 47 U.S.C. § 533(b)(1) (1994) *repealed by* Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, 124. Telephone companies subsequently have upgraded their networks to provide video services to certain municipalities.

[3] Specifically, S.B. 5 provides that any cable system that is "not the incumbent cable service provider and serves fewer than 40 percent of the total cable customers in a particular municipal franchise area may elect to terminate [its] municipal franchise and seek a state-issued certificate of franchise authority." § 66.004(b).

[4] "A cable service provider or a video service provider that currently has or had previously received a franchise . . . is not eligible to seek a state-issued certificate of franchise authority . . . until the expiration date of the existing franchise agreement." § 66.004(a).

First Amendment and the Equal Protection Clause and is preempted by federal anti-redlining law. TCA argued that S.B. 5 singled out five cable operators for discriminatory treatment, depriving them of the convenience of a statewide franchise. In addition, the plaintiff asserted that, because S.B. 5 allowed potential entrants to the cable market to define their own service footprint and required the PUC to grant the franchise, it conflicted with federal anti-redlining law.

Shortly thereafter, four additional parties intervened as defendants: (1) Grande Communications Networks, Inc., the largest overbuilder in Texas, which had terminated its municipal franchises after passage of S.B. 5 in favor of a state-issued franchise; (2) Verizon Southwest, a telephone company that obtained a franchise under S.B. 5 shortly after its enactment; (3) AT&T Texas, another telephone company that acquired a franchise under S.B. 5[5]; and (4) the Texas Coalition of Cities for Utility Issues (TCCFUI), which promotes the interests of Texas municipalities. The PUC defendants and intervenors moved for judgment on the pleadings.

The district court dismissed TCA's claims for lack of ripeness and Article III standing under Federal Rule of Civil Procedure 12(b)(6), determining that TCA failed to show "that the Act will inflict inevitable or even probable harm on its member cable operators at this time." We reversed and remanded, holding that "[d]iscriminatory treatment at the hands of the government is an injury long recognized as judicially cognizable." *Hudson*, 265 F. App'x at 218 (internal quotation marks omitted).

On remand, Time Warner Cable, an incumbent cable provider with numerous unexpired municipal franchises, joined TCA as a plaintiff. Each side moved for summary judgment. After determining that the plaintiffs had

---

[5] Grande, Verizon, and AT&T filed a joint brief and will be referred to collectively as the industry defendants.

established sufficient injury to give them standing, the district court denied the plaintiffs' motion and granted the defendants' motion for summary judgment, determining that S.B. 5 survived intermediate scrutiny. The district court rejected the plaintiffs' argument that federal anti-redlining law in 47 U.S.C. § 541 preempts S.B. 5. This appeal followed.

After the district court granted summary judgment in favor of the defendants but before we heard oral argument, the Texas Legislature passed S.B. 1087. *See* Tex. Util. Code § 66.004(b-1)–(b-2). That bill modified S.B. 5 by authorizing cable incumbents to terminate their municipal franchises in favor of the statewide license, but only for municipalities with fewer than 215,000 people. *Id.*[6] As it currently stands, S.B. 5 allows certain incumbents the ability to apply for a statewide franchise, but the legislation continues to exclude Time Warner and one other TCA member from opting out of their remaining unexpired municipal franchise agreements with cities of over 215,000 people.[7]

## II.

Before we address the plaintiffs' arguments on appeal, the industry defendants repeat a threshold argument that this court previously rejected at the motion to dismiss stage: namely, that the plaintiffs have not established Article III standing to complain of S.B. 5 but instead have offered only "speculations" of injury.[8] We review questions of standing *de novo*. *NAACP v.*

---

[6] "[A] cable service provider or video service provider in a municipality with a population of less than 215,000 that was not allowed to or did not terminate a municipal franchise under Subsection (b) may elect to terminate not less than all unexpired franchises in municipalities with a population of less than 215,000 and seek a state-issued certificate of franchise authority. . . ." § 66.004(b-1).

[7] Time Warner Cable has unexpired franchise agreements with Dallas, Corpus Christi, and Irving, while another TCA incumbent retains a franchise with Lubbock. The municipal franchises expire in the following years: Irving in 2013, Lubbock in 2014, Dallas in 2015, and Corpus Christi in 2017.

[8] Neither the TCCFUI nor the PUC defendants contest the plaintiffs' Article III standing.

*City of Kyle, Tex.*, 626 F.3d 233, 236 (5th Cir. 2010). As the parties seeking federal court jurisdiction, TCA and Time Warner bear the burden of establishing their standing. *See Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011).

The standing requirement originates from the Constitution confining federal courts to "Cases" and "Controversies." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (standing "set[s] apart the 'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III"). The "irreducible constitutional minimum of standing contains three elements": injury-in-fact, causal connection, and redressability. *Id.* at 560–61.

The industry defendants concentrate primarily on the injury-in-fact element because plaintiffs allegedly failed to prove any concrete economic damages.[9] The injury-in-fact requirement helps ensure that courts resolve legal questions "not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 472 (1982).

As noted above, this court has already decided that TCA's pleadings alleged sufficient injury-in-fact to survive a motion to dismiss. Specifically, we held that TCA claimed sufficient economic *and* constitutional injury. As to the latter:

> The [TCA] contends that the Act unlawfully discriminates against its membership by unjustifiably favoring non-incumbents over incumbents. Discriminatory treatment at the hands of the government is an injury long recognized as judicially cognizable.

---

[9] We can dispose briefly of the industry defendants' arguments that plaintiffs failed to show causal connection or redressability. S.B. 5 expressly prevents the plaintiffs from obtaining a statewide franchise, while conferring the benefit on other cable and video providers. Given this direct exclusion, there is "little question that the action or inaction has caused [their] injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62.

And such injury is recognizable for standing irrespective of whether the plaintiff will sustain an actual or more palpable injury as a result of the unequal treatment under law or regulation. Here, the Act facially discriminates against the [TCA's] membership by extending the benefit of a state-wide license to its competitors while denying that same benefit to incumbent cable providers. . . . [S]uch discrimination can constitute an injury because it positions similar parties unequally before the law; no further showing of suffering based on that unequal positioning is required for purposes of standing.

*Hudson*, 265 F. App'x at 218 (internal quotation marks and citations omitted).

In their haste to insist on additional evidence, the industry defendants completely ignore this clear language. Instead, they emphasize the opinion's earlier observation that general allegations may suffice for a motion to dismiss, while specific facts must be adduced to survive summary judgment. *Id.* at 216 (quoting *Lujan*, 504 U.S. at 561). Nevertheless, "the nature and extent of facts that must be averred (at the summary judgment stage) . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue." *Lujan*, 504 U.S. at 561. There can be no dispute that the plaintiffs are the object of the government action here where S.B. 5 singles out certain incumbent operators as ineligible for the benefit of a statewide franchise.[10] When the government targets certain speakers for the exclusion of benefits bestowed on similar parties, "no further showing of suffering based on that unequal positioning is required for purposes of standing." *Hudson*, 265 F. App'x at 218; *see also Lujan*, 504 U.S. at 561–62.

Consequently, the industry defendants' argument that the plaintiffs fail to establish that the disparate treatment "imposes any burden *at all* on

---

[10] *Compare* Tex. Util. Code § 66.004(a) (making incumbent operators ineligible for a statewide franchise until their existing municipal franchises expire) *with* Tex. Util. Code § 66.004(b) (allowing overbuilders "that [are] not the incumbent cable service provider" to terminate their existing municipal franchises and obtain a statewide franchise) *and* Tex. Util. Code § 66.004(b-1) (allowing incumbent operators in municipalities with less than 215,000 people to immediately terminate their existing municipal franchise) *and* Tex. Util. Code § 66.003(a) (allowing new entrants to obtain a state-level franchise immediately).

No. 10-51113

incumbent cable operators" misses the point.[11]  TCA and Time Warner need not prove that they will sustain a quantifiable economic injury.  *Cf. Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 588 (1983) (observing that "the very selection of the press for special treatment threatens the press not only with the current *differential* treatment, but with the possibility of subsequent differentially *more burdensome* treatment" and "[t]hus, even without actually imposing an extra burden on the press, the government might be able to achieve censorial effects").  S.B. 5 subjects the plaintiffs to disparate treatment by allowing their competitors to opt out of municipal franchises in favor of the convenience of a statewide license.  Because the legislation targets the plaintiffs for exclusion from this benefit provided to similarly situated speakers, TCA and Time Warner have shown constitutional injury sufficient to establish standing.

### III.

On appeal, the plaintiffs contend that S.B. 5 is preempted by federal law and that it violates the First and Fourteenth Amendment.  We begin with the preemption argument.

The plaintiffs rest their preemption attack on a conflict preemption claim. "Conflict preemption requires that it would be physically impossible for a private party to comply with both federal and state law, or that the law stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 334 (5th Cir. 2007) (internal alteration and quotation marks omitted).

---

[11] Moreover, the fact that the industry defendants are Time Warner's competitors (AT&T, Verizon, and Grande), who vigorously oppose Time Warner's eligibility for the same statewide franchise that they currently enjoy, undermines their argument that the convenience confers no economic benefit.  In other words, if the state franchise provided no competitive advantage, it is unlikely the industry defendants would invest so many resources in opposing its extension to Time Warner.

Specifically, the plaintiffs contend that the Federal Communications Act conflicts with and therefore preempts S.B. 5 because Congress requires that the franchising authority assure that redlining does not occur. *See* 47 U.S.C. § 541(a)(3) ("In awarding a franchise . . . a franchising authority shall assure that access to cable service is not denied to any group of potential residential cable subscribers because of the income of the residents of the local area in which such group resides."). According to the plaintiffs, S.B. 5 contradicts this clear anti-redlining command because it requires the PUC simply to approve franchise applications, rendering the agency powerless to protect against a perceived red-lining problem at the time of issuing the franchise. *See* Tex. Util. Code § 66.003(b) (providing that the PUC "shall issue a certificate of franchise authority" after receiving the necessary affidavits).

This argument mischaracterizes the law. Rather than conflicting with Congress's anti-redlining command, the Texas statute expressly prohibits income discrimination in terms that mirror the FCA. *See* § 66.014(b) ("A cable service provider or video service provider that has been granted a state-issued certificate of franchise authority may not deny access to service to any group of potential residential subscribers because of the income of the residents in the local area in which such group resides."). When applying for a franchise, the applicant must submit an affidavit affirming that it "agrees to comply with all applicable federal and state statutes and regulations." § 66.003(b)(2). More to the point, *in awarding a franchise*, S.B. 5 requires the PUC to include language in the license expressly conditioning any grant of authority to the lawful operation of the cable service. § 66.003(c)(3). The PUC then retains the authority to monitor the deployment of cable services. § 66.014(e). Finally, S.B. 5 authorizes the PUC to hold proceedings to determine whether a provider is violating the anti-redlining provisions, § 66.014(c), and a court of competent jurisdiction may then invoke sanctions for noncompliance, including the revocation of the franchise authority. § 66.015(a).

Given this harmony between state and federal law, the plaintiffs present a conflict preemption claim without any conflict. The Texas statute prohibits income discrimination, commands an applicant to swear an affidavit that it will abide that standard, requires the state agency to condition the license to the continued compliance with that standard, and authorizes the agency to determine non-compliance, which may ultimately lead to revocation of the franchise. In doing so, S.B. 5 fully authorizes the PUC to fulfill the Congressional mandate that in awarding franchises, the agency "shall assure" that income discrimination does not occur. We therefore hold that the anti-redlining provisions of the Federal Communications Act do not preempt S.B. 5.

## IV.

We turn now to the question of whether S.B. 5 violates the First Amendment. This court reviews the grant of summary judgment *de novo*, applying the same legal standard as the district court. *Greater Hous. Small Taxicab Co. Owners Ass'n v. City of Hous., Tex.*, 660 F.3d 235, 238 (5th Cir. 2011); *see also Ortiz v. Quarterman*, 504 F.3d 492, 496 (5th Cir. 2007) ("We review questions of constitutional law, including the constitutionality of a State statute, *de novo*.").

Our First Amendment analysis begins with determining the applicable level of scrutiny. Although together the various parties insist on all three possible levels,[12] "[t]here can be no disagreement on an initial premise: Cable programmers and cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment." *Turner*, 512 U.S. at 636. Here, S.B. 5 is not a law of general applicability as it excludes statewide franchises from certain incumbents and

---

[12] TCA and Time Warner argue that we should apply strict scrutiny but that S.B. 5 is unconstitutional regardless of whether we apply strict or intermediate scrutiny. The industry defendants and the PUC assert that S.B. 5 is subject to, and fails, intermediate scrutiny. TCCFUI contends that S.B. 5 should be reviewed only under rational basis scrutiny because it does not implicate First Amendment interests.

singles out elements of the press for special treatment. Therefore, we must determine which form of heightened scrutiny to apply. *See id.* at 641 ("Because the must-carry provisions impose special obligations upon cable operators and special burdens upon cable programmers, some measure of heightened First Amendment scrutiny is demanded.").

### A.

The plaintiffs argue that S.B. 5 must endure strict scrutiny because it targets only a few incumbents. We agree.

Laws singling out a small number of speakers for onerous treatment are inherently suspect. For example, the Supreme Court applied strict scrutiny to Minnesota's ink and paper tax because it not only singled out the press but also targeted a small number of newspapers. *Minneapolis Star*, 460 U.S. at 591 (holding that the practical effect of a $100,000 exemption "is that only a handful of publishers pay any tax at all, and even fewer pay any significant amount of tax."). "Whatever the motive of the legislature in this case," the Court held that a state's power to target a small selection of speakers "presents such a potential for abuse that no interest suggested by Minnesota can justify the scheme" under strict scrutiny. *Id.* at 591–92. Indeed, selecting "such a narrowly defined group to bear the full burden of the tax" caused the law "to resemble more a penalty for a few of the largest newspapers." *Id.* at 592.

The Supreme Court subsequently followed *Minneapolis Star* to apply strict scrutiny to a state sales tax that exempted certain magazines in a way "that only a few Arkansas magazines pay any sales tax." *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229 (1987). Thus, "*Arkansas Writers' Project . . .* reaffirmed the rule" that differential treatment of the press "through the narrow targeting of individual members offends the First Amendment." *Leathers v. Medlock*, 499 U.S. 439, 446 (1991) (citing *Ark. Writers' Project*, 481 U.S. at 224–26). Indeed, the Court has reiterated this rule even in cases that did not require strict scrutiny because the laws at issue did not specifically target a

small number of speakers.  *See Turner*, 512 U.S. at 661–62 (applying only intermediate scrutiny to a federal regulation because it required "almost all cable systems in the country, rather than just a select few" to carry local stations and therefore "the provisions do not pose the same dangers of suppression and manipulation that were posed by the more narrowly targeted regulations in *Minneapolis Star* and *Arkansas Writers' Project*"); *Leathers*, 499 U.S. at 448 (holding that the state law at issue "extended [the state] sales tax uniformly to the approximately 100 cable systems then operating in the State" so that it "hardly resembles a penalty for a few") (internal quotation marks omitted).

Here we are faced with a law that plainly discriminates against a small and identifiable number of cable providers.[13]  As recently amended, S.B. 5 permits incumbents to terminate their municipal franchise in favor of a statewide franchise, unless the municipality in question has a population over 215,000.  § 66.004(b-1).  The plaintiffs represent, and the defendants do not dispute, that only Time Warner and one other incumbent have unexpired franchises with municipalities of that size.  Even before the amendment limited the exclusion to these two incumbents, plaintiffs argued that S.B. 5's treatment of incumbents discriminated against five incumbents.[14]  In response, defendants pointed only to deposition testimony that a few small "mom and pop" operators also exist and that the five incumbents represent 95 percent to 99 percent of those initially excluded by S.B. 5.  In *Minneapolis Star*, however, the law "target[ed] a small group of newspapers" where thirteen publishers paid a tax, one of which paying two-thirds of the total burden, because "only a handful of

---

[13] At oral argument, the defendants pointed out that S.B. 5 does not mention the individual cable providers by name.  As *Minneapolis Star* and *Arkansas Writers' Project* make clear, however, a law may target a small number of speakers without expressly identifying those singled out.  Rather, legislation "targets a small group" by structuring its burdens in a way that apply to the few.  *Minneapolis Star*, 460 U.S. at 591.

[14] These five incumbents include Time Warner Cable, Comcast, Charter, Suddenlink, and CableOne, all of which are members of the plaintiff TCA.

publishers pay any tax at all, and even fewer pay any significant amount of tax." *Minneapolis Star*, 460 U.S. at 578–79, 591. Regardless, the current law removes any doubt that it impacts a small number of speakers as it focuses the exclusion on incumbents of a few large cities. Consequently, the exclusion of this handful of incumbents is structured "in a manner that carries the inherent risk of undermining First Amendment interests." *Turner*, 512 U.S. at 661.

Defendants protest that such a standard reduces the level of constitutional scrutiny to a counting exercise. In the arena of constitutional rights, however, there is often safety in numbers. *See Minneapolis Star*, 460 U.S. at 585 ("A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected."); *Ark. Writers' Project*, 481 U.S. at 228 ("We need not fear that a government will destroy a selected group of taxpayers by burdensome taxation if it must impose the same burden on the rest of its constituency.") (quoting *Minneapolis Star*, 460 U.S. at 585); *Leathers*, 499 U.S. at 448 ("The danger from a tax scheme that targets a small number of speakers is the danger of censorship."). Allowing the state to burden the few sets the stage for manipulation in the marketplace of ideas. *See Minneapolis Star*, 460 U.S. at 585 (observing that the mere threat of differential treatment "can operate as effectively as a censor to check critical comment"). Moreover, a law that targets a small handful of speakers for discriminatory treatment "suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional."[15] *Id.* Therefore, "we cannot countenance such treatment unless the State asserts a counterbalancing interest of compelling importance" that cannot be achieved without the exclusion of certain incumbents from the statewide franchise. *Id.*

---

[15] We emphasize that "[w]e need not and do not impugn the motives of the [Texas] legislature." *Minneapolis Star*, 460 U.S. at 592. "Illicit legislative intent is not the *sine qua non* of a violation of the First Amendment." *Id.*

The defendants also argue that strict scrutiny is not warranted here because the problematic provisions are "justified by some special characteristic of the particular medium being regulated." *Turner*, 512 U.S. at 660–61 (internal quotation marks omitted). They rely on *Turner* where the Supreme Court applied intermediate scrutiny to a law imposing must-carry obligations on cable operators only because the cable medium uniquely allowed for the bottleneck control that explained Congress requiring just cable operators, and not other video service providers, from carrying certain stations. *See id.* at 661. *Turner* made clear, however, that the must-carry requirement impacted "almost all cable systems in the country, rather than just a select few" and therefore, that statute did "not pose the same dangers of suppression and manipulation that were posed by the more narrowly targeted regulations in *Minneapolis Star*." *Id.* Moreover, this case differs from *Turner* because there are no similar characteristics of the cable medium that would justify S.B. 5 excluding certain incumbent cable providers—and not other incumbents, overbuilders, and new entrants—from a statewide franchise.

Applying strict scrutiny, the exclusion of certain incumbents violates the First Amendment. The state fails to show that the exclusion "is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Ark. Writers' Project*, 481 U.S. at 231. Indeed, none of the defendants even argued that the relevant provisions of S.B. 5 would meet such an exacting standard. This is not surprising in this case where, as discussed in the following section, the discriminatory provisions would not survive the more relaxed standard of intermediate scrutiny. We therefore hold that S.B. 5's discrimination against a small number of speakers is unconstitutional.

## B.

Even assuming the defendants are correct that intermediate scrutiny applies, the legislation's exclusion of incumbents would not survive. Under intermediate scrutiny, we would sustain the provisions if they "further an

important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *Turner*, 512 U.S. at 662 (quoting *United States v. O'Brien*, 391 U.S. 367, 377 (1968). While the regulation need not be "the least speech-restrictive means" of advancing the state's interests, the means chosen must be narrowly tailored so they "do not burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* (internal quotation marks omitted).

The government emphasizes that creating the statewide franchise promotes its legitimate interest in facilitating competition. We do not question the significance of the state's interest in promoting competition. *See id.* at 664 ("[T]he Government's interest in eliminating restraints on fair competition is always substantial, even when the individuals or entities subject to particular regulations are engaged in expressive activity protected by the First Amendment."). However, promoting competition bears no relationship to the problematic exclusions at issue here. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424 (1993) (holding under intermediate scrutiny that the city's distinguishing between commercial and noncommercial speech "bears no relationship *whatsoever* to the particular interests that the city has asserted. It is therefore an impermissible means of responding to the city's admittedly legitimate interests."). The advantages of a statewide franchise explain why the state created this pro-competition benefit, but they do not justify the exclusion of other speakers from that same benefit.

The state also asserts an interest in protecting the reliance of municipalities who entered into contracts with cable providers. However, the plaintiffs argue persuasively that S.B. 5 already protects the reliance of municipalities on their franchise agreements because cable providers that opt out must still: 1) pay municipalities the maximum franchise fee allowed under

federal law;[16] 2) provide the same number of public, educational, and governmental access channels;[17] and 3) furnish municipalities the same institutional network capacity, which supports services like traffic light coordination.[18] Moreover, the text of S.B. 5 casts to the wayside the agreements of most municipalities in Texas, indicating the actual unimportance of the state's asserted interest. The law allows overbuilders to renege on their contracts with municipalities in favor of a statewide franchise. Tex. Util. Code § 66.004(b). And although defendants initially insisted that S.B. 5 could still further municipal reliance by preserving the primary agreements with incumbents, the legislature amended the law to allow incumbents to terminate their arrangements with all municipalities with a population under 215,000. § 66.004(b-1). At oral argument, the state provided no logical explanation why the reliance interests of heavily populated municipalities should matter more than those of less populated municipalities. Finally, this same disregard for the reliance of most municipalities indicates a lack of "fit" between the asserted municipal reliance interest and the state's "choice of a limited and selective [number of municipalities to protect] as the means chosen to serve those

---

[16] S.B. 5 requires licensees to pay a fee of 5% of gross revenue. Tex. Util. Code § 66.005(a) ("The holder of a state-issued certificate of franchise authority shall pay each municipality in which it provides cable service or video service a franchise fee of five percent based upon the definition of gross revenues as set forth in this chapter."). Federal law caps the franchise fee at 5%. 47 U.S.C. § 542(b) ("[T]he franchise fees paid by a cable operator with respect to any cable system shall not exceed 5 percent of such cable operator's gross revenues . . . ."). Indeed, plaintiffs point out that some municipal agreements have a lower franchise fee than the federal maximum.

[17] "The holder of a state-issued certificate of franchise authority shall provide no fewer than the number of PEG access channels a municipality has activated under the incumbent cable service provider's franchise agreement as of September 1, 2005." § 66.009(b).

[18] This institutional network capacity provides a "private line" data network that cities may use for non-commercial purposes. See § 66.006(d) ("[I]nstitutional network capacity, however defined or referred to in the municipal cable franchise but generally referring to a private line data network capacity for use by the municipality for noncommercial purposes, shall continue to be provided at the same capacity . . . .").

interests." *Discovery Network*, 507 U.S. at 416. *See id.* at 417–18 (applying intermediate scrutiny to a ban on newsracks providing commercial handbills and agreeing that the "benefit to be derived from the removal of 62 newsracks while about 1,500-2,000 remain in place" was "paltry" and "minute"); *Turner*, 512 U.S. at 664 ("That the Government's asserted interests are important in the abstract does not mean, however, that the must-carry rules will in fact advance those interests.") (plurality opinion); *Knowles v. City of Waco, Tex.*, 462 F.3d 430, 436–37 (5th Cir. 2006) (striking down parade ordinance allegedly justified by traffic control and safety interests because the city "is so willing to disregard the traffic problems" with exceptions to the ordinance) (internal quotation marks omitted). Thus, even under intermediate scrutiny, the provisions would not pass constitutional muster.

V.

We hold that the provisions excluding incumbents from a statewide franchise violate the First Amendment.[19] We consequently REVERSE the district court's grant of summary judgment on behalf of the defendants and REMAND for proceedings consistent with this opinion. Acknowledging that the plaintiffs have waited long to validate rights that are time-sensitive, we trust the district court will handle the matter expeditiously.

---

[19] In light of this holding, we do not reach the plaintiff's claim that S.B. 5 violates the Equal Protection Clause of the Fourteenth Amendment.