**16-2158-cv**
*MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy, et al.*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM, 2016

ARGUED: NOVEMBER 28, 2016
DECIDED: JUNE 21, 2017

No. 16-2158-cv

MGM RESORTS INTERNATIONAL GLOBAL
GAMING DEVELOPMENT, LLC,
*Plaintiff-Appellant,*

*v.*

DANNEL P. MALLOY, in his official capacity as Governor of
Connecticut; DENISE MERRILL, in her official capacity as Connecticut
Secretary of the State; JONATHAN A. HARRIS, in his official capacity
as Commissioner of the Connecticut Department of Consumer
Protection,
*Defendants-Appellees.*

————

Appeal from the United States District Court
for the District of Connecticut.
No. 3:15 Civ. 1182 – Alvin W. Thompson, *Judge.*

————

Before: WALKER, SACK, and CHIN, *Circuit Judges.*

————

Plaintiff-appellant MGM Resorts International Global Gaming Development, LLC ("MGM"), a developer of casinos and other commercial gaming enterprises, appeals a judgment of the United States District Court for the District of Connecticut (Thompson, *J.*) dismissing its complaint against the State of Connecticut for lack of Article III standing. MGM claims that Special Act 15-7 (the "Act") of the Connecticut General Assembly, which creates a special registration pathway for the state's two federally recognized Indian tribes to apply to build commercial casinos on non-Indian land, places it at a competitive disadvantage in the state's gaming industry. Because MGM has failed to allege any specific plans to develop a casino in Connecticut, we conclude that any competitive harms imposed by the Act are too speculative to support Article III standing. We therefore AFFIRM the judgment of the district court.

———

KEVIN KING (Thomas Brugato, Covington & Burling LLP, Washington, DC; Neil K. Roman, Cléa Liquard, Covington & Burling LLP, New York, NY, *on the brief*), Covington & Burling LLP, Washington, DC, *for Plaintiffs-Appellants.*

ROBERT J. DEICHERT, Assistant Attorney General, *for* George Jepsen, Attorney General, Hartford, CT, *for Defendants-Appellees.*

———

JOHN M. WALKER, JR., *Circuit Judge*:

Plaintiff-appellant MGM Resorts International Global Gaming Development, LLC ("MGM"), a developer of casinos and other commercial gaming enterprises, appeals a judgment of the United States District Court for the District of Connecticut (Thompson, *J.*) dismissing its complaint against the State of Connecticut for lack of Article III standing. MGM claims that Special Act 15-7 (the "Act") of the Connecticut General Assembly, which creates a special registration pathway for the state's two federally recognized Indian tribes to apply to build commercial casinos on non-Indian land, places it at a competitive disadvantage in the state's gaming industry. Because MGM has failed to allege any specific plans to develop a casino in Connecticut, we conclude that any competitive harms imposed by the Act are too speculative to support Article III standing. We therefore AFFIRM the judgment of the district court.

## BACKGROUND

In 2015, the Connecticut General Assembly enacted Special Act 15-7, which establishes a framework through which Connecticut's two federally-recognized Indian tribes, the Mashantucket Pequot and the Mohegans (the "Tribes"), may seek to negotiate with municipalities to establish commercial casinos on non-reservation land. Under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*, federally recognized Indian tribes

may establish casinos on tribal land by entering into compacts with the surrounding state, subject to the approval of the Secretary of the Interior. By contrast, gaming on non-tribal land ("commercial gaming") is regulated by the law of the relevant state. The Tribes already operate two casinos—Foxwoods and Mohegan Sun—on tribal land in Connecticut, which were established pursuant to IGRA.

Special Act 15-7 establishes a process by which the Tribes may jointly apply to establish commercial casinos elsewhere in Connecticut. It mandates that if the Tribes wish to pursue commercial gaming opportunities on non-tribal land, they must form a "tribal business entity" (TBE) for that purpose. A TBE is a business entity registered with the Connecticut Secretary of the State, and jointly owned by both of the Tribes. § 1(a)(1). It is the only entity permitted to negotiate with municipalities on behalf of the Tribes. Though the Act allows a TBE to negotiate for the establishment of new commercial casinos, it mandates that the Connecticut General Assembly amend state law to expressly "provide for the operation of and participation in" a new gaming facility by the Tribes before any new casino can be built. § 1(c)-(d). The Act also requires that any requests for proposals ("RFPs") issued by a TBE regarding the establishment of a casino on non-

tribal land be submitted to the state Department of Consumer Protection ("DCP"), and published on that agency's website. § 1(b).

While the Act requires the Tribes to establish a TBE in order to pursue commercial casino development, it makes no mention of any other potential market actors. The parties dispute the meaning of this omission. MGM interprets the statutory language to mean that only the Tribes are authorized to establish commercial casinos in Connecticut at all, because the Act is the only statute that provides any entity with an express right to enter into such negotiations with municipalities. The state argues that nothing in the Act prevents other developers from soliciting municipalities for contracts, and that it imposes a unique burden on the Tribes by requiring them to partner with each other through a TBE in order to compete for contracts. No Connecticut state court decision has interpreted the Act or suggested any path toward resolving this dispute.

Proceeding on its interpretation of the Act that a non-tribal land casino requires the establishment of a TBE, on July 23, 2015, MGM attempted to register a TBE with the Connecticut Secretary of the State as a preliminary step to issuing RFPs to municipalities for potential casino developments. The Secretary rejected the application on the ground that it "[did] not comply with Connecticut law" because MGM has "no affiliation with either of [the] Tribes." [Amended Complaint ¶ 53, App'x 23-24]. MGM claims that it

remains interested in establishing a commercial casino in Connecticut.[1] According to MGM's brief, "[a]s part of its development and expansion efforts," it has "conducted a study analyzing the viability of a casino in Connecticut and concluded that such a development would be both feasible and desirable." [Appellant's Br. At 13]. However, MGM does not appear to be currently engaged in negotiations with any municipalities on specific projects.

The Tribes registered a TBE with the Secretary of the State on August 24, 2015. Shortly thereafter, they published an RFP on the website of the state Department of Consumer Protection. While the Tribes' negotiations to build a casino remain "ongoing," no development agreement has been executed.

On August 4, 2015, MGM filed a complaint in the District of Connecticut seeking a declaratory judgment and other relief on the basis that Special Act 15-7 violates the Equal Protection Clause of the Fourteenth Amendment and the dormant Commerce Clause. On June 23, 2016, the district court dismissed the complaint under

[1] MGM is currently opening two new casinos in Maryland and Springfield, Massachusetts. The Springfield development agreement prevents it from building another casino within fifty miles of that development site. That provision would preclude MGM from contracting with most municipalities in Connecticut, but not those in the southwestern portion of the state, which is of course the portion closest to the largest population centers of New Jersey and New York (including New York City).

Federal Rule of Civil Procedure 12(b)(1), after determining that MGM had not suffered a concrete harm and therefore did not have Article III standing. MGM now appeals.

## DISCUSSION

We review *de novo* a district court's grant of a motion to dismiss. *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003). At the pleading stage, a reviewing court must accept as true any facts plausibly alleged in a complaint, and must draw all inferences in favor of the plaintiff. *Id*.

### I.    Article III standing

In order to demonstrate Article III standing to pursue a claim in federal court, a plaintiff must demonstrate: (1) an "injury in fact," which is "an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "a causal relationship between the injury and the challenged conduct," establishing "that the injury fairly can be traced to the challenged action of the defendant, and has not resulted from the independent action of some third party not before the court"; and (3) a "likelihood that the injury will be redressed by a favorable decision," such that "the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative." *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 663–64 (1993) (internal

quotation marks and citations omitted); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).

MGM alleges that Special Act 15-7 imposes two distinct harms on it, each of which would be sufficient to confer standing. First, MGM claims that the Act authorizes only the Tribes to pursue commercial casino development in Connecticut, and that it therefore excludes it and all other potential competitors from the Connecticut commercial gaming market completely. Second, MGM argues that even if the Act is read not to exclude non-Tribe competitors from the market, it still confers a competitive advantage on the Tribes by granting them the exclusive right to publicize their bids on the DCP's website, and by "signaling" the state's preference for Tribe-sponsored casinos over other proposed projects.

MGM alleges that these preferences violate (1) the Equal Protection Clause of the Fourteenth Amendment, U.S. CONST., amend. XIV, § 1, because they discriminate in favor of the Tribes on the basis of race, and (2) the dormant Commerce Clause, U.S. CONST., Art. I, § 8, cl. 3, because they discriminate on the basis of state citizenship. Both parties agree that the standing inquiry for dormant Commerce Clause and equal protection claims is the same. An injured plaintiff has standing to raise an equal protection claim when the state imposes "unequal treatment" on the basis of a protected characteristic, such as race. *Heckler v. Mathews*, 465 U.S.

728, 738 (1984). A plaintiff has standing to raise a dormant Commerce Clause claim when it has sustained "an injury resulting from a burden on interstate commerce." *Loyal Tire & Auto Ctr., Inc. v. Town of Woodbury*, 445 F.3d 136, 151 (2d Cir. 2006); *see also Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 286 (1997) (noting that "unconstitutional discrimination against interstate commerce" constitutes a "cognizable injury" for Article III standing purposes). MGM's dormant Commerce Clause claims must therefore be resolved in the same manner as its equal protection claims

We address both of MGM's alleged injuries in turn. Because we find that neither of the harms alleged by MGM constitutes an "injury in fact," we confine our analysis to the first element of the standing inquiry.

### A.    Injury in Fact

Whether a party has demonstrated an injury in fact is resolved by a two-step analysis. A court must determine (1) whether the asserted injury is "concrete," and (2) whether it is "actual or imminent." *City of Jacksonville*, 508 U.S. at 663. The first prong requires that the alleged injury is "particularized" to the plaintiff, rather than "conjectural or hypothetical." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) (quoting *Lujan*, 504 U.S. at 560). The second prong requires that the alleged injury is, if not actual, at least

"*certainly* impending" and "not too speculative." *Id*. (quoting *Lujan*, 504 U.S. at 565 n.2 (emphasis in original)).

**1.    Special Act 15-7 does not exclude MGM from the Connecticut casino market**

With respect to MGM's first argument, we agree with the district court that Special Act 15-7 does not prevent bidders other than the Tribes from entering the Connecticut casino market. MGM asserts that the Act establishes the exclusive pathway by which a developer can negotiate with a municipality for the establishment of a commercial casino. It reasons that because the Act only specifies the procedures by which the Tribes may enter into those negotiations, only the Tribes have been granted express authorization to pursue casino contracts under Connecticut law.

But Connecticut has provided municipalities with a general authority to enter into contracts under a separate statute, Conn. Gen. Stat. § 7-194. Nothing in Special Act 15-7, or any other authority, prohibits non-tribal developers from negotiating with municipalities to develop commercial gaming enterprises. MGM argues that a municipal contract to develop a casino would be void for illegality under Connecticut state law, which generally prohibits gambling. *See* Conn. Gen. Stat. § 53-278b (prohibiting gambling); Conn. Gen. Stat. § 52-533 (declaring contracts for gambling activities void as against public policy); *see also Sokaitis v. Bakaysa*, 293 Conn. 17, 27

(2009) (noting that contracts for gambling activities are void, unless those activities are "expressly authorized by law" (emphasis omitted)). But even assuming that this is true, MGM cites no authority to suggest that Conn. Gen. Stat. § 7-194 prohibits developers like MGM from entering into development agreements with municipalities that are subject to future state approval, which is all that Special Act 15-7 allows the Tribes to do. *See* Special Act 15-7 § 1(c)-(d) (conditioning the Tribes' right to develop commercial casinos on express authorization by the Connecticut General Assembly).

Under Connecticut's statutory interpretation rules, which are binding here, Connecticut statutes must be interpreted primarily according to the plain meaning of their text. *See Martin v. Hearst Corp.*, 777 F.3d 546, 550 (2d Cir. 2015) (noting that the Second Circuit is "bound to interpret Connecticut law according to Connecticut's own interpretive rules"); *see also* Conn. Gen. Stat. § 1-2z (providing that in Connecticut, "[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes"). The most straightforward reading of these provisions is that MGM and any other developers are permitted to negotiate with municipalities for contingent future gaming contracts under Conn. Gen. Stat. § 7-194, and that Special Act 15-7 in no way restricts that right. Because MGM's claim that it

is excluded from the Connecticut casino market is unsupported by the text of the Act, exclusion from the market cannot form the basis of MGM's Article III standing.

**2.    The competitive harms MGM alleges are not sufficiently imminent to confer Article III standing**

MGM next argues that, even if Special Act 15-7 does not exclude non-tribal businesses from the Connecticut casino market, it nonetheless confers special competitive benefits on the Tribes that give them an unfair advantage in the bidding process. Specifically, the Act both gives the Tribes the exclusive "right" to publicize their RFPs on the Department of Consumer Protection's website, and gives the appearance of state preference for Tribe-sponsored projects.

We agree with MGM that its Complaint alleges a sufficiently concrete harm, and therefore satisfies the first prong of the "injury-in-fact" analysis. Where, as here, a plaintiff alleges that it has been denied equal protection in its attempt to secure a state contract, it does not need to prove that it would have ultimately been awarded the contract absent the alleged discrimination. *City of Jacksonville*, 508 U.S. at 666. It need only show that it was denied the ability "to compete on an equal footing in the bidding process." *Id*. While Connecticut contends that the Act does not give the Tribes a competitive advantage, at the pleading stage all of MGM's factual

allegations must be accepted as true and all inferences must be drawn in its favor. *See WC Capital Mgmt., LLC v. UBS Secs., LLC*, 711 F.3d 322, 328-29 (2d Cir. 2013). MGM's complaint plausibly alleges that the RFP requirement reallocates state resources—specifically, space on the website of a state agency—in a discriminatory manner, and that the Act generally encourages municipalities to favor the Tribes' projects over others. If MGM's assertions are correct, this places it at a disadvantage in attracting negotiating partners for future development sufficient to trigger protection under the Equal Protection Clause and the dormant Commerce Clause.

MGM's alleged harms fail, however, to satisfy the second requirement of the "injury-in-fact" analysis, because MGM has not shown that those harms are "imminent" or "*certainly* impending." *Adarand*, 515 U.S. at 211. In previous cases, courts have required that a plaintiff who challenges a barrier to bidding on public contracts actually make a bid on the contracts at issue, or at least establish standing by proving that it very likely would have bid on the contract but for the alleged discrimination. In *Warth v. Seldin*, 422 U.S. 490 (1975), for example, the Supreme Court held that the plaintiffs—an association of construction firms—did not have standing to challenge a local zoning ordinance because they had produced "no averment that any member has applied . . . for a building permit or variance with respect to any current project," nor

any evidence "that respondents have delayed or thwarted any project" by the association's members, *id.* at 516.

By contrast, in *City of Jacksonville*, the Supreme Court held that the plaintiffs—businesses challenging a local ordinance requiring that a certain percentage of the city's contracts be awarded to minority-owned companies—did have standing, because they "regularly bid on contracts in Jacksonville and would bid on those that the city's ordinance makes unavailable to them." 508 U.S. at 668. The Court distinguished *Warth* on the basis that the plaintiffs in *Warth* were not actively seeking building permits at the time they filed their complaint, and that they had therefore not alleged "an injury of sufficient immediacy to warrant judicial intervention." *Id.* (alterations and internal quotation marks omitted). Likewise, in *Adarand*, the Court held that the plaintiff—a contractor—did not have standing to challenge the federal government's practice of giving financial incentives to hire subcontractors controlled by "socially and economically disadvantaged individuals," because the plaintiff did not make an "adequate showing that sometime in the relatively near future it will bid on another Government contract" affected by the incentives. 515 U.S. at 211; *see also In re U.S. Catholic Conference (USCC)*, 885 F.2d 1020, 1028–29 (2d Cir. 1989) (holding that plaintiffs lacked standing to challenge tax determinations by the IRS that allegedly favored the political advocacy of anti-abortion

Catholic groups, because "by their own admission" the plaintiffs "choose not to match the Church's alleged electioneering with their own" and were "[t]herefore . . . not competitors").

Here, MGM has pleaded only that it is "interested" in exploring development opportunities in Connecticut, and that it has made initial studies of the viability of a casino in the state. It has not alleged any concrete plans to enter into a development agreement with a Connecticut municipality, or demonstrated any serious attempts at negotiation.[2] MGM cites to an out-of-circuit case—*Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Board*, 172 F.3d 397 (6th Cir. 1999)—to argue that it only needs to show that it is "able and ready" to bid on a contract, not that is actively engaged in an ongoing negotiation. *Id*. at 404

---

[2] In a Rule 28(j) Letter, MGM contended that it has Article III standing under the United States Supreme Court's recent opinion in *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 580 U.S. __, (2017). We disagree. *Czyzewski* is far removed from this case. There, employee judgment creditors of their employer company, which was in bankruptcy, challenged a structured "dismissal" that placed their claims at a lower priority than those of other creditors. 137 S. Ct. at 978. The Supreme Court rejected the trustee's argument that, because there would be insufficient assets to pay the employees' claims regardless of the outcome of their suit, the employees lacked standing to challenge the bankruptcy court's ruling. *Id*. at 982-83. Standing existed because the ruling impaired the employees' position in ongoing negotiations that could lead to a recovery. *Id*. Here, by contrast, MGM is not actively engaged in any negotiations to develop a casino in Connecticut, and has not alleged any concrete plans to do so in the foreseeable future. Any "disadvantage" MGM might suffer in future contract negotiations is purely speculative.

(emphasis omitted) (quoting *City of Jacksonville*, 508 U.S. at 666). However, *Lac Vieux* is consistent with the *Warth* and *City of Jacksonville* line of precedent. In *Lac Vieux*, Michigan and the City of Detroit each passed laws that established an express "preference" for one of the plaintiff tribe's competitors in a bidding process to build a casino in downtown Detroit. *Id*. at 401. The competitor submitted an RFP for the casino project, while the plaintiff tribe did not. *Id*. at 402. The tribe challenged the city and state laws as unconstitutional, and the Sixth Circuit held that it had standing to pursue the case, on the ground that it had demonstrated it was "able and ready" to bid on the contract. *Id*. at 404-05.

But in *Lac Vieux*, the challenged set-aside applied to a specific casino development for which bidding was ongoing. *Id*. at 402. Moreover, the plaintiff tribe had submitted to the district court substantial evidence that it had: (1) participated in past casino development in Michigan; (2) had secured financing to pursue to the present development; and (3) would have submitted an RFP in the ongoing bidding process, but for the express preference granted to its competitors. *Id*. at 405. The court found these facts dispositive of the standing analysis under *City of Jacksonville*, holding that "[t]he evidence shows that Lac Vieux was ready and able to submit a proposal and that it was willing and able to pay the associated fees." *Id*. at 406. Here, by contrast, MGM has not alleged that there is any

specific project that it is prevented from bidding on by the Act. Nor has it asserted that it has made any serious effort at locating a municipal partner or securing financing to bid on a project. It has simply expressed a general interest in the market, and made preliminary studies of the viability of a casino project. These alleged steps do not indicate that MGM is ready to participate in a specific bidding process, and that it is only prevented in doing so by the alleged benefits provided to the Tribes. Any competitive harm to MGM is therefore too remote and conjectural to support Article III standing.

MGM also cites to a First Circuit case, *KG Urban Enterprises, LLC v. Patrick*, 693 F.3d 1 (1st Cir. 2012), in which a non-tribal casino development company was found to have standing to challenge a Massachusetts gaming law on equal protection grounds, despite the fact that no bidding process had begun. *Id.* at 16-17. *KG Urban* is distinguishable, however. That case involved a facial challenge to a state statute as to which Massachusetts had conceded that the effect of the statute was to "preclude a competitive license from being awarded to non-tribal applicants" in certain areas of the state entirely. *Id.* at 17. Connecticut makes no such concession here. *KG Urban* might have been relevant for MGM's claim that it has standing to challenge Special Act 15-7's supposed total ban on non-tribal bids in Connecticut, but we have already rejected that claim

based on the plain meaning of the statutory text. The case is not relevant to MGM's claim that the RFP publication requirement and the Act's "signaling" effect interfere in the competitive process, and does not bear on the imminence aspect of that inquiry.

**B.     MGM does not have standing under the Supreme Court's decision in *Heckler v. Mathews***

Lastly, MGM argues that even if the competitive harms it alleges are not imminent it still has standing to challenge the constitutionality of Special Act 15-7 because the law is discriminatory on its face. In support of this position, it cites the United States Supreme Court's opinion in *Heckler v. Mathews*, 465 U.S. 728 (1984), which MGM claims eliminated the "imminence" requirement when a plaintiff is challenging a facially discriminatory statute.

MGM misreads *Mathews*. That case concerned a discriminatory amendment to the Social Security Act. The amendment required married men applying for spousal Social Security benefits to prove that they were economically dependent on their wives, but created an "exception" for women that did not require them to make a similar showing. 465 U.S. at 728. The statute also contained a severability clause, which stated that if any portion of the law was held unconstitutional, the "exception" clause could not be expanded to include previously uncovered parties (*i.e.*, men).

Instead, the only permissible remedy was for a court to declare the entire provision void, such that it could not be applied to any Social Security applicant of either gender. *Id*.

Theoretically, this eliminated the standing of men to challenge the clause, because any challenge would be un-redressable: Men could never gain the benefits that were denied to them by suing; they could only cause women to lose those benefits. Despite Congress's "adroit attempt to discourage the bringing of an action by destroying standing," *id*. at 737, the Supreme Court held that the plaintiff, Mathews, could challenge the statute even though he personally would not obtain a monetary benefit from a favorable ruling. *Id*. The court concluded that Mathews had a legally cognizable right not to be subject to a regime that denied him certain benefits solely on the basis of gender. *Id*.

But critically for our purposes, *Mathews* did not change the requirement that a plaintiff demonstrate an injury in fact in order to establish Article III standing. A plaintiff still must show that he was denied an actual, rather than a conjectural, benefit (or that he sustained some other actual harm) in order to challenge a government action in a federal court. In *Mathews*, the denial of a tangible benefit was never in dispute. The plaintiff would have been eligible to receive extra Social Security payments (an extra $153.30 in the mail every month, to be precise) had the amendment applied the

same eligibility criteria to men and women. *Id.* at 738 ("[A]ppellee claims a type of personal injury we have long recognized as judicially cognizable. He alleges that the pension offset exception subjects him to unequal treatment in the provision of his Social Security benefits solely because of his gender; specifically, as a nondependent man, he receives fewer benefits than he would if he were a similarly situated woman." (footnote omitted)). Later Supreme Court cases have reaffirmed that a plaintiff must prove that he has personally suffered a concrete and particularized injury. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016) (noting that a "bare procedural violation, divorced from any concrete harm" does not satisfy the injury-in-fact requirement); *Allen v. Wright*, 468 U.S. 737, 757 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014).

The plaintiff in *Mathews* was a long-tenured civil servant who had taken affirmative steps to establish his eligibility for the extra Social Security benefits he sought, and indisputably would have been entitled to receive them were it not for the discriminatory amendment being challenged. By contrast, MGM has not made any serious attempt to obtain the benefit it claims that it was denied (*i.e.*, the right to compete on equal footing for development rights). MGM cannot identify any "*certainly* impending" competitive harm that it

will suffer, *Adarand*, 515 U.S. at 211, because it is not presently competing for anything.

MGM incorrectly suggests that *Mathews* eliminated the "injury-in-fact" requirement in discrimination cases, by holding that *any* race- or gender-based classification is *itself* a judicially cognizable harm. To be sure, *Mathews* did state that an injury resulting from discrimination could be emotional or psychic, rather than monetary. As the Court explained:

> [L]ike the right to procedural due process, the right to equal treatment guaranteed by the Constitution is not co-extensive with any substantive rights to the benefits denied the party discriminated against. Rather, as we have repeatedly emphasized, discrimination itself, by perpetuating 'archaic and stereotypic notions' or by stigmatizing members of the disfavored group as 'innately inferior' and therefore as less worthy participants in the political community, can cause serious non-economic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group.

465 U.S. at 739–40 (citations omitted). But this holding did not eliminate the need to show an "injury in fact" (incorporating the dual requirement of concreteness and imminence); it simply expanded the definition of what constitutes such an injury to include emotional as well as tangible harms. As the Supreme Court has since emphasized, in order to adequately plead a harm (whether psychic or monetary) based on discriminatory treatment under a statute, a

plaintiff still must prove he personally would have been subject to the discriminatory terms of the law. *See Allen*, 468 U.S. at 755 ("Our cases make clear, however, that such injury accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." (quoting *Mathews*, 465 U.S. at 739-40)); *see also O'Shea v. Littleton*, 414 U.S. 488, 496-97 (1974).

MGM, a corporation, has not alleged psychic or emotional harm stemming from the passage of Special Act 15-7, and it is doubtful that it could. Moreover, because MGM has no concrete plans to negotiate for casino development rights in Connecticut, it is not "personally denied equal treatment" by the allegedly discriminatory terms of Special Act 15-7, and therefore does not have standing to challenge it.  *Allen*, 468 U.S. at 755.

MGM claims that other federal circuit courts of appeal have interpreted *Mathews* to eliminate the imminence requirement where a plaintiff challenges a discriminatory classification. In particular, it cites to the Fifth Circuit's opinions in *Texas Cable & Telecommunications Ass'n v. Hudson,* 265 F. App'x 210 (5th Cir. 2008) (*Hudson I*) and *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630 (5th Cir. 2012) (*Hudson II*). These cases cited *Mathews* for the proposition that "[d]iscriminatory treatment at the hands of the government is an injury long recognized as judicially cognizable," and that "such

injury is recognizable for standing irrespective of whether the plaintiff will sustain an actual or more palpable injury as a result of the unequal treatment under law or regulation." *Hudson II*, 667 F.3d at 636 (citation omitted).

But this holding only reiterates the rule articulated in *Mathews* that once a plaintiff is subject to a discriminatory classification, he has standing to bring suit. In *Hudson*, the plaintiffs indisputably were subject to the terms of the challenged statute. In that case, cable companies in Texas that did not have existing contracts with municipalities were allowed to apply for more advantageous state operating licenses, while companies with existing municipal contracts were explicitly barred from applying for those licenses. 667 F.3d at 633-34. The Fifth Circuit held this disparate treatment of otherwise similarly situated economic competitors was sufficiently discriminatory to constitute an injury in fact for standing purposes. *Id*. at 636. But in *Hudson* the plaintiff telecommunications companies were already participating in the Texas telecom market, and were therefore immediately subject to the allegedly discriminatory terms of the act which placed them at a competitive disadvantage.

MGM's participation in the Connecticut casino market, unlike the *Hudson* plaintiffs' participation in the Texas telecom market, is still entirely conjectural. Even if Special Act 15-7 excludes MGM from accessing the "benefits" of the RFP publication requirement

and the signaling effects of the state's supposed public support, this argument fails for the same reason set forth above. These "harms" can only be conceived of as competitive harms that create an "uneven playing field." But for a competitive harm to confer standing, there must be some actual competition underway that the "uneven playing field" distorts. A purely abstract competition, based only on MGM's expression of "interest" and some preliminary studies, without any concrete steps toward a bid for a Connecticut casino, is insufficient.[3]

**CONCLUSION**

We have considered MGM's remaining arguments, and we find them unavailing. We therefore AFFIRM the judgment of the district court.

---

[3] Our conclusion does not rule out the possibility that MGM's alleged harm may at some future point become sufficiently imminent. That possibility, though, is at this time only hypothetical and we therefore need not address it.