# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 7, 2008

Charles R. Fulbruge III
Clerk

No. 06-51514

TEXAS CABLE & TELECOMMUNICATIONS ASSOCIATION

Plaintiff - Appellant

v.

PAUL HUDSON, in His Official Capacity as Chairman of the Public Utility Commission of Texas; JULIE PARSLEY, in Her Official Capacity as Commissioner of the Public Utility Commission of Texas; BARRY SMITHERMAN, in His Official Capacity as Commissioner of the Public Utility Commission of Texas

Defendants - Appellees

and

TEXAS COALITION OF CITIES FOR UTILITY ISSUES; GTE SOUTHWEST INC, doing business as Verizon Southwest; SOUTHWESTERN BELL TELEPHONE LP, doing business as SBC Texas; GRANDE COMMUNICATIONS NETWORKS INC

Intervenor Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:05-CV-721

Before JOLLY, DAVIS, and WIENER, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:[*]

The Texas Cable & Telecommunications Association ("TCTA"), on behalf of its member cable providers, filed suit challenging a statute recently enacted by the Texas legislature that was intended to reform the cable service industry in the state. The TCTA claimed the statute was unconstitutional primarily because it unjustifiably discriminated against its members, who are incumbent cable providers, in favor of those providers who would now be permitted to enter the market under the new statutory scheme. Furthermore, the TCTA also alleged that the Texas statute violated the Supremacy Clause. The district court dismissed the complaint under Rule 12(b)(6), Fed. R. Civ. P., holding that the TCTA lacked standing because no discernable injury had occurred and that the case was not yet ripe for litigation. The TCTA appeals that dismissal. We hold that the TCTA's complaint adequately alleges Article III standing to survive a Rule 12(b)(6) motion. The district court therefore erred in dismissing the complaint, requiring that we therefore REVERSE and REMAND for such further proceedings as are appropriate.

I.

This case arises from an effort by the Texas legislature to overhaul the regulation of the cable industry and video programming in the state. Understanding this effort requires some description of the system that the legislature sought to replace.

A variety of different groups compete to bring video programming to Texas communities. Many communities have a single "incumbent" cable operator, often the operator that first introduced cable services to that community. These

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

cable operators now face direct competition from overbuilders—companies that build cable systems in areas that are already served by another cable operator—and from telephone companies attempting to expand into new markets.

All of these cable providers—incumbents, overbuilders, and telephone companies—must use public rights of way to install their equipment. In order to use these public facilities, the original cable providers in a community had to seek the permission of municipalities before constructing their cable systems. This permission took the form of "franchise agreements," long-term contracts with municipalities in which cable operators were allowed to build their systems in exchange for extensive municipal regulation, including the payment of fees.

The terms of the franchise agreements came under federal regulation in 1984, when Congress added Title VI to the Federal Communications Act. Title VI allows these franchise agreements, but requires that the franchise agreements meet certain federal standards. A franchising authority must assure, for example, that franchisees do not deny cable services to potential subscribers based on the low income of the region in which the potential subscribers reside. Later amendments addressed competition. Franchising authorities are now prohibited from granting exclusive franchises to cable operators, many of which had monopolies in their respective local markets. Congress also repealed a ban that prevented telephone service providers from entering the video services market. Although these measures encouraged competition in the cable industry, many cable operators in Texas still operated as monopolies in their respective franchise areas.

The growth of competition, that is, allowing new entrants into the municipal markets, was hindered because franchise agreements remained at the local, rather than state, level. A new entrant to the cable service market, such as a telephone company, would therefore have to negotiate separate contracts

with each target municipality. The costs of negotiating these individual license agreements, and the potential for variance among them, led to the passage of the "Act Relating to Furthering Competition in the Communications Industry" ("the Act"), an amendment to the Texas Utility Code.

The Act creates a state (as opposed to a local) franchising process. A new entrant must first petition the Texas Public Utility Commission ("the PUC") for permission to operate in the communities it seeks to enter. If the new entrant is able to satisfy some very basic requirements, the PUC is obliged to grant the requested certificate of franchise authority for the market or markets applied for. Incumbent providers, however, are explicitly excluded from this process for the communities in which they operate and remain bound to their previous franchise agreements. On the other hand, overbuilders operating in the same market as the incumbent are allowed to terminate their municipal agreements in favor of the new state certification process. This disparate treatment of incumbents, as opposed to new entrants and overbuilders, led to the lawsuit at issue here. The TCTA, representing its members, filed suit the day after the passage of the Act, seeking to have the Act declared unlawfully discriminatory and to enjoin its enforcement.

## II.

The TCTA claimed that the Act violated the United States Constitution in several respects. According to the TCTA, the Act's discrimination against its members by favoring new entrants and overbuilders is without reasonable justification, and consequently violates the First Amendment, and the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The TCTA further claimed that the Act is incompatible with various sections of the Federal Communications Act, and thus is in violation of the Supremacy Clause. Several interested parties intervened on behalf of the state defendants and filed motions to dismiss. The district court, largely on the strength of an in-court statement

by the TCTA that "it's too soon to tell" what impact the Act will have on the profit of its members and competition among cable providers, found that each of the claims made by the TCTA were non-justiciable for lack of standing and ripeness. More specifically, the district court concluded that the TCTA failed to allege a concrete, cognizable injury suffered, or likely to be suffered, by any of its members and, moreover, had admitted that the time was not ripe for making such a determination. The district court therefore granted a rule 12(b)(6) motion to dismiss for failure to state a claim with respect to all defendants and intervenor-defendants. This appeal followed.

### III.

The TCTA argues that it has alleged straightforward injuries that make its claims justiciable. The new regulatory structure created by the Act discriminatorily removes certain regulatory restrictions on potential competitors while leaving those restrictions in place with respect to incumbent cable providers; this competitive disadvantage to incumbent providers, it is argued, results in a justiciable economic injury, irrespective of whether the TCTA's members have actually yet faced the increased competition. Further, the TCTA argues that the statute's unreasonable categorization and consequent differing treatment of various service providers—new entrants and overbuilders against incumbents—alone constitutes a cognizable constitutional injury. And, concerning both injury and ripeness, the TCTA urges that it never made a general admission before the district court that its members had not yet suffered an injury. Instead, the TCTA contends that it only acknowledged that it is too soon to tell whether the injury will mean its member providers will have to operate at an actual deficit. Finally, with respect to ripeness, the TCTA points out that its various complaints about the Act are purely legal—no further factual development is necessary in order for the case to proceed.

A number of arguments supporting the district court's ruling, as well as alternative arguments, are advanced by various of the defendants. At the bottom of all of these, however, is the same complaint: lack of detail in the TCTA's allegations. The TCTA did not specify which of its members would be injured; nor did it allege the precise harms that its members would suffer under the Act. This lack of specificity was construed by the district court—and is now argued by the defendants— to mean that the TCTA lacked standing because no one member of the TCTA is alleged to face an actual economic harm; the TCTA therefore could show no "concrete" injury. Moreover, this uncertainty about the precise effect that the Act would have on the TCTA's members led the district court to conclude that the TCTA had filed suit prematurely. Thus, the possibility that the Act had no effect on some of the TCTA's membership, and that it may not have economically disadvantaged all of those that it did affect, was sufficient reason to find justiciability lacking.

Several prospective competitors to the TCTA's members join in this argument, but along slightly different lines. Expanding on a brief statement made by the district court, they urge that the TCTA has challenged the Act on its face; as such, the TCTA must show not only that the Act is unconstitutional in all of its applications, but that it also has caused concrete injury in all of its applications. The argument continues, asserting that, because of the nature of the TCTA's claims, its failure to state the specific ways in which all or any of its members have been injured is fatal to a claim of standing.

Precisely the same considerations animate the challenge to the TCTA's assertion of associational standing. The Texas Coalition of Cities for Utility Issues ("TCCUI") argues that the TCTA lacks associational standing because the Act will have diverse effects on the TCTA's membership—some members will not be put at a disadvantage and those that are will be disadvantaged in widely varying degrees. As a result, the TCCUI claims that the participation of the

TCTA's individual members is necessary to resolve this case, and the TCTA thereby lacks standing to bring suit on behalf of a group with such diverse interests and alleged, but undetermined, injuries.

IV.

A.

The district court dismissed the TCTA's complaint for lack of standing under Rule 12(b)(6). Thus, as we have made clear, the precise and only issue before us is whether, for purposes of surviving a Rule 12(b)(6) motion, the plaintiffs have alleged grounds for standing. Dismissals under Rule 12(b)(6) are reviewed de novo. Lowrey v. Tex. A&M Univ. Sys., 117 F.3d 242, 246 (5th Cir. 1997).

> A motion to dismiss under rule 12(b)(6) is viewed with disfavor and is rarely granted. The complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. The district court may not dismiss a complaint under rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. . . . The question therefore is whether in the light most favorable to the plaintiff and with every doubt resolved in his behalf, the complaint states any valid claim for relief.

Id. at 247 (internal citations and quotation marks omitted). We begin with the proposition that the Constitution of the United States limits the jurisdiction of federal courts to "Cases" and "Controversies." Allen v. Wright, 468 U.S. 737, 750 (1984). A central element of this jurisdictional limitation is the doctrine of standing, which "set[s] apart the 'Cases' and 'Controversies' that are of the justiciable sort referred to in Article III." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). Standing ensures that a plaintiff has "'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Warth v. Seldin, 422 U.S. 490, 498–99 (1975) (quoting Baker v.

Carr, 369 U.S. 186, 204 (1962)). Accordingly, an association may appear as a plaintiff so long as it is asserting either its own interests as an association or by appearing "solely as the representative of its members." Id. at 511.

In order to have such representational standing, an association must satisfy three requirements: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977). Thus, because standing must exist independently among the association's membership, "representational standing . . . does not eliminate or attenuate the constitutional requirement of a case or controversy." See Warth, 422 U.S. at 511. The association must still show that "its members, or any one of them" have standing. Id.

The Supreme Court has "established that the irreducible constitutional minimum of standing contains three elements": injury-in-fact, causation, and redressability. Lujan, 504 U.S. at 560. Only injury-in-fact is in dispute here. Though the terms used in defining an injury-in-fact are "concededly not susceptible of precise definition," Allen, 468 U.S. at 751, the plaintiff is required to show "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Lujan, 504 U.S. at 560. (internal citations and quotation marks omitted). What's more, "a plaintiff must demonstrate standing for each claim he seeks to press." DaimlerChrysler Corp. v. Cuno, 126 S. Ct. 1854, 1867 (2006).

B.

Before reaching the substantive issues related to standing, the procedural posture of this case—dismissal on the pleadings—requires some comment, for it informs the adequacy of the TCTA's claims for standing. The burden of

establishing the elements of standing is on the party seeking jurisdiction in the federal courts.  Lujan, 504 U.S. at 561.  And "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."  Id.  Evidently then, the requirements of the plaintiff with respect to a motion to dismiss and an adversarial motion for summary judgment will be substantially different.  Indeed, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'"  Id. (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 889 (1990)) (alteration in original).  In contrast, general allegations will not suffice for summary judgment; specific facts must be adduced instead.  See id.

As in this case, the stage of litigation determined the standing analysis in Bennett v. Spear, 520 U.S. 154 (1997).  In Bennett, a number of plaintiffs objected to a biological opinion issued by the Fish and Wildlife Service.  Id. at 157.  That biological opinion, which was mandated by the Endangered Species Act of 1973, suggested that certain reservoirs maintain minimum water levels for the purpose of protecting indigenous species of life.  Id. at 157–58.  The plaintiffs complained that such minimum levels would diminish their use of the reservoirs for irrigation and other purposes, causing them injury.  Id. at 160.

The government contended that the plaintiffs had no standing to bring such a suit.  Id. at 161.  Specifically, the government argued that the plaintiffs' allegations failed to satisfy the injury-in-fact element of standing "because they demonstrate only a diminution in the aggregate amount of available water, and do not necessarily establish . . . that petitioners will receive less water."  Id. at 167. But the court, relying on Lujan, rejected this argument: "Given petitioners' allegation that the amount of available water will be reduced and that they will

be adversely affected thereby, it is easy to presume specific facts under which petitioners will be injured." Id. at 168. Because the facts necessary for the aggregate diminution of available water to harm the petitioners reasonably could be inferred, the court found the injury-in-fact standing requirement satisfied. See id.

This appeal presents an analogous situation. The TCTA has made general allegations of direct harm, arguing that the Act singles out incumbent cable providers for treatment different from other parties. Perhaps most significantly, the TCTA contends that all of its members are prepared to seek state-level franchises if they are permitted to do so, indicating that the TCTA members consider the Act to be to their universal benefit (if they can be included). As in Bennett, then, the TCTA's complaint has not identified a specific member who will be injured by the government action. But these allegations, referring to the general membership, state that the TCTA's membership is adversely affected by the Act through its discriminatory denial of a desirable benefit. The central inquiry before us, then, is whether the injuries that the TCTA generally alleges support the kind of reasonable inference made in Bennett by which a constitutionally sufficient injury-in-fact may be presumed.[1]

---

[1] The cases cited by the state defendants do not show that such a presumption may not be made on the facts before us. Instead they demonstrate that there must be some rational basis for that presumption. In both Public Citizen, Inc. v. Bomer, 274 F.3d 212 (5th Cir. 2001) and Ward v. Santa Fe Independent School District, 393 F.3d 599 (5th Cir. 2004), the plaintiffs had failed to show a connection between the alleged unconstitutional actions and an injury to the plaintiffs themselves. See Bomer, 274 F.3d at 218 (noting that the plaintiffs "point[ed] to no past case in which a judgment was tainted by contributions; they mention[ed] no current litigation in which an opposing party or lawyer contributed to the judge's campaign; and they merely speculate[d] as to the future"); Ward, 393 F.3d at 606 (noting that "[t]he only legal right or interest of the [plaintiffs] even vaguely asserted in the complaint is their right, as taxpayers, to make certain that public entities do not use tax revenue to support unconstitutional acts").

C.

The TCTA argues that its standing to challenge the Act is adequately supported by two types of injury: economic injury and constitutional injury. First, the TCTA alleges that the Act has the effect of depriving its members of revenue and profit and, second, that the Act inflicts a constitutional injury by unjustifiably treating incumbent cable providers differently from new entrants to the video services market. These injuries, in the light of Bennett, are more than sufficient to establish the TCTA's standing and require only brief comment.

Deprivation of revenue and profit is premised by the TCTA on lost business opportunities resulting from the Act's allowing new players into the TCTA members' respective municipal markets on more favorable terms. More specifically, the Act allows competitors to the incumbent cable providers to enter municipal markets with no requirement for municipal licensing and pass these savings on to consumers, while incumbents remain burdened with licensing costs. The TCTA therefore identifies its members' threatened loss of revenue with this increased competition that the Act allows. And the regulatory allowance of increased competition in a plaintiff's market has been established in our circuit as a clear injury-in-fact, see Environmental Defense Fund v. Marsh, 651 F.2d 983 (5th Cir. 1981); Hollingsworth v. Harris, 608 F.2d 1026, 1028 (5th Cir. 1979) (per curiam), even when such competition is inchoate, as it is here.[2] As a result, the presumption of Bennett is well-supported: the Act was passed

---

[2] Marsh, where the increased competition was government sponsored, illustrates this point well. There, a railroad and other plaintiffs objected to a governmental decision that made the construction of a canal more likely. See id. at 1003. Because the canal would compete with the railroad in the shipping market—and despite the fact that the canal's construction, much less its competition with the railroad was anything but imminent—the court found there to be sufficient injury for standing. See id. at 1004. See also Hollingsworth, 608 F.2d at 1028 (finding "[e]conomic 'injury' in the form of increased competition" adequate for standing where nursing home owner challenged administrative decision that would have allowed entry of competitor into market but where competition had not yet taken place); New England Public Commc'ns Council, Inc. v. FCC, 334 F.3d 69, 74 (D.C. Cir. 2003); Adams v. Watson, 10 F.3d 915, 921 (1st Cir. 1993) (collecting cases).

to increase competition and a reasonable inference may therefore be made that the TCTA's members are harmed at least to the same extent as the plaintiffs in Marsh and Hollingsworth.

D.

In addition to competitive or economic injury, a constitutional injury also provides standing. The TCTA contends that the Act unlawfully discriminates against its membership by unjustifiably favoring non-incumbents over incumbents. Discriminatory treatment at the hands of the government is an injury "long recognized as judicially cognizable." Heckler v. Mathews, 465 U.S. 728, 738 (1984). And such injury is recognizable for standing irrespective of whether the plaintiff will sustain an actual or more palpable injury as a result of the unequal treatment under law or regulation. See Ne. Fla. Chapter of the Associated Gen. Contractors of America v. City of Jacksonville, 508 U.S. 656, 666 (1993).[3] Here, the Act facially discriminates against the TCTA's membership by extending the benefit of a state-wide license to its competitors while denying that same benefit to incumbent cable providers. As Northeastern held, such discrimination can constitute an injury because it positions similar parties unequally before the law; no further showing of suffering based on that unequal

---

[3] Furthermore, the Supreme Court has recognized that such discrimination need not be predicated on suspect classifications to constitute cognizable injury. In Clinton v. City of New York, 524 U.S. 417 (1998), several groups challenged the constitutionality of the Line Item Veto Act. One of these groups, a farmer's cooperative, claimed that it was injured when the President canceled a tax benefit that would have aided it in obtaining certain processing facilities. See id. at 432. This tax benefit was one of a number of benefits instituted by Congress in the Taxpayer Relief Act of 1997, but only one of two that the President vetoed. Id. In defending the statute, the government argued that the cooperative had not shown that it "would have actually obtained a facility on favorable terms." Id. at 433 n.22. The court rejected this argument, citing Northeastern Florida for the proposition that "denial of a benefit in the bargaining process can itself create an Article III injury, irrespective of the end result." Id. The farmer's cooperative, consisting of Idaho potato farmers, assuredly was not a member of a suspect classification. We do note that this holding is illustrative of the fact that the line between constitutional and economic injury can sometimes be a bit blurred.

positioning is required for purposes of standing. Accordingly, the TCTA has alleged a constitutional injury that survives a Rule 12(b)(6) motion.[4]

### E.

Ripeness is the last matter requiring our attention. "To determine if a case is ripe for adjudication, a court must evaluate (1) the fitness of the issues for judicial decision, and (2) the hardship to the parties of withholding court consideration." Texas v. United States, 497 F.3d 491, 498 (5th Cir. 2007). The

---

[4] The reasons we have noted above are sufficient to conclude that the district court erred in dismissing the TCTA's complaint for lack of standing and that the case must proceed to the next step. We will, however, briefly note further arguments that defendants make regarding standing. Each lacks merit.

With respect to associational standing, only the third of the three requirements is directly challenged, that is that the individual participation of the members of the association is unnecessary. Member participation is not required here. The TCTA alleges that the Act increases competition for its membership. Such allegations are, in the light of Bennett and Marsh, more than sufficient to establish standing; the participation of the TCTA's members would merely provide more detail to the already sufficient general allegation that the TCTA's members will face increased competition due to the actions of the Texas legislature. Such economic data is not required under Northeastern Florida—discrimination and its coordinate loss of opportunity to compete is sufficient.

The defendants also argue that the TCTA has mounted a facial challenge; it therefore must show injury in every application of the Act. For standing purposes, the Supreme Court has said that "[w]hen asserting a facial challenge, a party seeks to vindicate not only his own rights, but those of others who may also be adversely impacted by the statute in question. In this sense, the threshold for facial challenges is a species of third party (jus tertii) standing." City of Chicago v. Morales, 527 U.S. 41, 55 n.22 (1999) (plurality opinion). See also Henderson v. Stalder, 287 F.3d 374, 385 n.4 (5th Cir. 2002) (Jones, J., concurring); Thibodeau v. Portuondo, 486 F.3d 61, 71 (2d Cir. 2007). But the TCTA is only asserting the interests of its members in a representational capacity, rather than the interests of third parties not before the court. The proper inquiry is therefore one of associational standing rather than third-party standing. Cf. United Food and Commercial Workers Union Local 751 v. Brown Group, Inc., 517 U.S. 544, 557 (1996) ("Indeed, the entire doctrine of 'representational standing,' of which the notion of 'associational standing' is only one strand, rests on the premise that in certain circumstances, particular relationships (recognized either by common-law tradition or by statute) are sufficient to rebut the background presumption (in the statutory context, about Congress's intent) that litigants may not assert the rights of absent third parties." (footnotes omitted)). In any event, both of the defendants' arguments that the dismissal of the complaint can be justified for failure to satisfy the standards of, first, associational standing, or, second, a facial challenge, lack merit.

doctrines of ripeness and standing "often overlap in practice, particularly in an examination of whether a plaintiff has suffered a concrete injury." Id. at 496. And such is the case here.

The dismissal for lack of ripeness apparently was based in substantial part on a statement made by the TCTA during oral argument before the district court, specifically, its answer that "it's too soon to tell" in response to the district court's questioning regarding the effect of the Act on the profits of the TCTA's members. The district court therefore appears to have concluded on that basis that the level of economic injury suffered by the TCTA's members was not yet discernable and therefore considered them not yet injured; thus the case was not fit for litigation. But, as set out above, allegations of tactile economic harm are not a necessary predicate of a cognizable injury, particularly given the procedural posture of this case at the time of dismissal. As such, no other events needed to have been alleged for the TCTA's stated injury to satisfy Article III requirements. In short, the defendants' ripeness argument lacks merit for essentially the same reasons that we have rejected their standing arguments.

IV.

We thus conclude that the TCTA has alleged injuries sufficient to satisfy the requirements of standing, and its claims are ripe for further proceedings. Accordingly, the judgment of the district court is REVERSED and the case is REMANDED for further proceedings not inconsistent with this opinion.