# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 17, 2025

Lyle W. Cayce
Clerk

—————————

No. 23-50419

—————————

Charter Communications, Incorporated; Time Warner Cable Texas, L.L.C.,

*Plaintiffs—Appellees*,

*versus*

Prewitt Management, Incorporated, *as General Partner of WAP, Limited, a Texas Limited Partnership*; WAP, Limited, *a Texas Limited Partnership*,

*Defendants—Appellants*.

———————————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:16-CV-1268

———————————————————————

Before Richman, Oldham, and Ramirez, *Circuit Judges*.

Per Curiam:[*]

After a new state law replaced city-issued permits for the construction and operation of cable systems in public rights-of-way with state-issued permits, the district court found that the purchaser of city-issued permits was

———————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-50419

no longer contractually required to make royalty payments to the seller. We REVERSE and REMAND.

## I

When cable television was in its infancy, cable providers needed access to public rights-of-way to construct, maintain, and operate the lines, cables, wiring, and other necessary apparatus. This required them to obtain permits from Texas cities. In 1963 and 1964, W.A. Prewitt, Jr. (Prewitt[1]) obtained permits from the cities of Waco, Temple, and McGregor (the Cities), authorizing him to construct, maintain, and operate cable systems in those cities.

## A

Ameco, Inc. (Charter[2]) sought to acquire Prewitt's permits, and on March 12, 1964, the parties entered into an agreement (the Agreement). The Agreement required Prewitt to form one or more Texas corporations as subsidiaries, which would be owned or run by Charter, to construct, own, and operate cable systems in the Cities. Prewitt would then lease his permits from the Cities to the subsidiary corporations. Charter agreed to pay Prewitt an initial lump sum and "3% of the gross revenue from the operation of the cable television systems" in the Cities during the lease term.

The Agreement also contained an option for Charter to purchase Prewitt's permits. If this option was exercised, the Agreement required Charter to pay Prewitt royalties in the amount of "3% of the gross revenues

---

[1] Appellants are WAP, Ltd, which acquired W.A. Prewitt, Jr.'s interests in the Agreement, and Prewitt Management, Inc. (collectively, "Prewitt").

[2] Appellees are Charter Communications, Inc., and its indirect subsidiary, Time Warner Cable Texas LLC (collectively, "Charter"), which acquired Ameco, Inc.'s interests in the Agreement.

from operation of the cable television systems in" the Cities in exchange for the permits, including *any new permits*:

> For the purposes of this agreement, in the event any new permit is granted to [Charter] or any assignee of any such permits, or any company directly or indirectly controlled by any of same before, at, or after the expiration of the existing permits, such new permit shall be conclusively treated and considered as a renewal of the existing permit, even if the terms thereof are new and different, and such three per cent [sic] (3%) of the gross revenues thereof shall be so paid to Prewitt, his heirs, successors, personal representatives and assigns, as aforesaid.

Charter's royalty-payment obligation was to remain "during the life of each such assigned permit and amendments thereto, and any holding over thereunder, renewals or extensions thereof."

About a year after Charter and Prewitt executed the Agreement, Charter, through its subsidiaries, exercised the purchase option. The parties executed instruments of assignment (IOAs) and chattel mortgages to convey the city-issued permits from Prewitt to Charter. The IOAs stated that Charter's royalty-payment obligation would "run with the permit[s]," including "any new permit" granted by one of the three cities. *See, e.g.*, Both the IOAs and the chattel mortgages clarified that if Charter breached its contractual duties, the permits would revert to Prewitt.

B

In 2005, the Texas Legislature passed the Texas Cable Act (the Act), which replaced the city-based permitting scheme. *See* Act of Sept. 7, 2005, 79th Leg., 2d C.S., ch. 2, § 27, 2005 Tex. Gen. Laws 25–34 (codified at Tex.

No. 23-50419

UTIL. CODE §§ 66.001–.017)[3]; *see also Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 633–34 (5th Cir. 2012). Under the Act, whenever a cable provider terminated an existing city permit, or a cable provider's permit from a city expired, the cable provider needed to apply for and receive a state-issued certificate of franchise authority (SICFA) from the Public Utility Commission to continue operating cable systems in the public rights-of-way. *See* TEX. UTIL. CODE §§ 66.001, .003(a), (c), .004(a). The Act did not "abrogate, nullify, or adversely affect in any way the contractual rights, duties, and obligations existing and incurred" by a cable provider before a city permit expired or was terminated. TEX. UTIL. CODE § 66.004(f) (the Savings Clause). The Savings Clause conditioned the acquisition of a SICFA on cable providers' promise to "honor[], pa[y], and perform[]" such contractual rights, duties, and obligations as though the cable providers "continued to operate" under a city permit "for the duration of" the SICFA and "any renewals or extensions thereof." *Id.*

In early 2006, Charter applied for and obtained a SICFA. On February 16, 2006, Charter amended the SICFA to cover Temple.[4] Charter did the same for Waco on August 21, 2006. Under a provision of the Act added in 2011, *see* TEX. UTIL. CODE § 66.004(b-1), Charter amended its SICFA to cover McGregor. When Charter's SICFA was amended to cover the Cities, the permits issued by each city were terminated. Despite termination of the permits, Charter continued to pay royalties to Prewitt. Charter made royalty payments without protest until October 2016, when it

---

[3] The Act regulates municipalities, not cities. *See, e.g.*, TEX. UTIL. CODE §§ 66.003(a), .004(a). The distinction between municipalities and cities is not legally significant to our analysis. *See generally* 22 DAVID B. BROOKS, TEXAS PRACTICE SERIES: MUNICIPAL LAW AND PRACTICE § 1.01 (2d ed. & June 2023 update).

[4] Cable providers may expand the "service area footprint" of their SICFAs through an amendment process. *See* 16 TEX. ADMIN. CODE § 28.6(g)(3).

made royalty payments to Prewitt under protest; it has not made any royalty payments since then. Charter continues to operate cable systems in the Cities to this day.

## C

Charter sued Prewitt in late December 2016, seeking a declaratory judgment that the Agreement had ended.[5] Prewitt counterclaimed, seeking a declaratory judgment that the Agreement had not ended as well as damages for the quarterly royalty payments Charter had not made.

The parties agreed to a one-day bench trial, which the district court held on August 21, 2018. On April 28, 2023, the district court issued its findings of fact and conclusions of law and a final judgment in Charter's favor. It held that "Charter's royalty-payment obligation for each city ended" when Charter's "SICFA and its amendments replaced" the city-issued permits and that the Savings Clause, "by its own language, does not affect the existing Agreement[] between the parties." *Charter Commc'ns, Inc. v. Prewitt Mgmt., Inc.*, No. 1:16-CV-1268, 2023 WL 3859027, at *5, *9 (W.D. Tex. Apr. 28, 2023); *see id.* at *4–8.

Prewitt appealed the district court's order under 28 U.S.C. § 1291.

## D

Because the record before us failed to establish the citizenship of the necessary parties, we ordered a limited remand for determination of whether diversity jurisdiction exists. *Charter Commc'ns, Inc. v. Prewitt Mgmt., Inc.*, No. 23-50419, 2024 WL 2044025, at *2 (5th Cir. May 8, 2024). On remand,

---

[5] Charter also sought damages for royalty payments made to Prewitt after the city permits terminated, contending that Prewitt had wrongfully collected these payments. Because Prewitt did not raise this issue, and Charter did not file a cross-appeal, it is not before us.

the district court ordered supplemental briefing from the parties and permitted Charter to file an amended complaint. It concluded that diversity jurisdiction exists between the parties[6] and provided us with a supplemental record. We agree. Having cleared the jurisdictional hurdle, we now turn to the merits. *See Hines v. Stamos*, 111 F.4th 551, 564 (5th Cir. 2024) (resolving a jurisdictional issue before ruling on the merits).

## II

Following a bench trial, we review the district court's legal conclusions and mixed questions of fact and law *de novo. In re Luhr Bros., Inc.*, 325 F.3d 681, 684 (5th Cir. 2003). "The district court's factual findings are binding unless clearly erroneous." *Rivera v. Kirby Offshore Marine, L.L.C.*, 983 F.3d 811, 816 (5th Cir. 2020); *see Horton v. U.S. Steel Corp.*, 286 F.2d 710, 713 (5th Cir. 1961) (district court's findings of fact on appeal come "well armed with the buckler and shield of" Rule 52(a)).

## III

Prewitt first argues that the district court erred in finding that, under the plain language of the Agreement, Charter's royalty-payment obligation for each city ended when Charter's SICFA and its amendments replaced the city-issued permits. It contends that "any new permit" refers to any permit under which Charter operates as a cable provider, so Charter's

---

[6] Charter is a citizen of Delaware, Connecticut, and New York. Prewitt is a citizen of Texas, California, Washington, Arkansas, and Arizona.

No. 23-50419

royalty-payment obligations remain so long as Charter serves as a cable provider in the Cities.

A

Because our "subject matter jurisdiction is based on diversity," interpretation of the Agreement requires us to apply "the substantive law of the forum state." *Boyett v. Redland Ins. Co.*, 741 F.3d 604, 607 (5th Cir. 2014). "Where, as here, the proper resolution of the case turns on the interpretation of Texas law, we are bound to apply Texas law as interpreted by the state's highest court." *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel LLC*, 620 F.3d 558, 564 (5th Cir. 2010) (citation modified). If the Supreme Court of Texas "has not spoken on [a] particular issue, 'it is the duty of the federal court to determine as best it can, what the [Supreme Court of Texas] would decide.'" *Barfield v. Madison County*, 212 F.3d 269, 272 (5th Cir. 2000) (quoting *Transcontinental Gas v. Transportation Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992)). "Intermediate state courts of appeals' decisions can be persuasive, but are not controlling." *Harken Expl. Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 471 n.3 (5th Cir. 2001).

The Texas Supreme Court has made clear that "[a]bsent ambiguity, contracts are construed as a matter of law." *Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015). The principal concern when construing a contract is "giv[ing] effect to the written expression of the parties' intent." *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994); *see Fox v. Thoreson*, 398 S.W.2d 88, 92 (Tex. 1966) ("Interpretation of a written instrument is always a quest for the intention of the parties to it."). If a contract's language unambiguously evinces the parties' "objective intent," the contract governs. *Harris Cnty. Water Control & Improvement Dist. No. 89 v. Phila. Indem. Ins. Co.*, 31 F.4th 305, 310 (5th Cir. 2022) (applying Texas law). When contracting parties define specific terms, "those

7

definitions control the interpretation of the agreement." *Sloane v. Goldberg B'Nai B'Rith Towers*, 577 S.W.3d 608, 618 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Otherwise, "undefined terms are typically given their plain, ordinary, and generally accepted meaning." *Skeels v. Suder*, 671 S.W.3d 664, 671 (Tex. 2023); *see Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 529 (Tex. 1987) ("Language should be given its plain grammatical meaning unless it definitely appears that the intention of the parties would thereby be defeated.").

To ascertain the contracting parties' intent under Texas law, we "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). "No single provision taken alone is given controlling effect; rather, each must be considered in the context of the instrument as a whole." *Plains Expl.*, 473 S.W.3d at 305; *see State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995) ("[C]ourts must be particularly wary of isolating from its surroundings or considering apart from other provisions a single phrase, sentence, or section of a contract."). After applying the rules of contract interpretation, if a contract "can be given a definite or certain legal meaning," the contract is unambiguous and must be construed as a matter of law. *Frost Nat. Bank v. L & F Distributors, Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam). A contract is ambiguous "if, after applying the rules of construction, it remains 'subject to two or more reasonable interpretations.'" *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 119 (Tex. 2015) (quoting *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex. 1998)). Ambiguities do not arise "simply because the parties offer

conflicting interpretations."[7] *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).

B

While Prewitt's reading of "any new permit" as meaning *any* new permit regardless of whether it is a city-issued permit or a SICFA gives the phrase its literal meaning, this reading fails to examine the other language in the Agreement. *See Point Energy Partners Permian, LLC v. MRC Permian Co.*, 669 S.W.3d 796, 808 (Tex. 2023) (admonishing "read[ing] contractual phrases in isolation"). "'[A] primary determinant of meaning' is context." *Finley Res., Inc. v. Headington Royalty, Inc.*, 672 S.W.3d 332, 339 (Tex. 2023) (quoting *Brown v. City of Houston*, 660 S.W.3d 749, 754 (Tex. 2023)). The Supreme Court of Texas has warned that "[l]anguage cannot be interpreted apart from context." *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 441 (Tex. 2011); *see In re Off. of the Att'y Gen.*, 456 S.W.3d 153, 155 (Tex. 2015) ("The meaning of words read in isolation is frequently contrary to the meaning of words read contextually in light of what surrounds them. Given the enormous power of context to transform the meaning of language, courts should resist rulings anchored in hyper-technical readings of isolated words or phrases."). Interpreting contracts requires "a holistic approach aimed at ascertaining intent from all words and all parts" of a contract. *Hysaw v. Dawkins*, 483 S.W.3d 1, 13 (Tex. 2016).

To ensure that we "avoid 'taking literalism too literally and adopting a wooden construction foreclosed by the [Agreement]'s context,'" *Point*

---

[7] Although they advance different interpretations, the parties agree that the Agreement is unambiguous. *See Tawes v. Barnes*, 340 S.W.3d 419, 425 (Tex. 2011) ("[C]onstruction of an unambiguous contract is a question of law."). Their agreement does not preclude us from finding the Agreement ambiguous. *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018).

No. 23-50419

*Energy*, 669 S.W.3d at 808 (original alterations omitted) (quoting *Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421, 451 (Tex. 2011) (WILLETT, J., concurring)), we turn to the surrounding language.

1

The Agreement begins by recognizing that Prewitt obtained permits from the Cities authorizing the construction, maintenance, and operation of "community antenna systems (CATV systems)." It explains that Prewitt sought to enter into the Agreement for the purpose of "leasing *such permits*," referring to the city-issued permits. *See Such*, BLACK'S LAW DICTIONARY (rev. 4th ed. 1968)[8] ("Of that kind, having particular quality or character specified. . . . Identical with, being the same as what has been mentioned."). In the section on the lease terms, the property Prewitt promises to lend is "one or more of the above named permits," referring again to the city-issued permits. And when the lease ends, "[t]he permits *from the cities* (sometimes referred to herein as 'the permits' or 'the city permits'), shall be and remain the property of Prewitt."

Then the Agreement's section on the purchase option identifies what Prewitt is offering: "an option to purchase such *city permits*." The subparts that follow lay out the terms of Charter's purchase option. *See Sommers for Ala. & Dunlavy, Ltd. v. Sandcastle Homes, Inc.*, 521 S.W.3d 749, 755 n.13 (Tex. 2017) ("[T]he 'material contained in unindented texts relates to all the following indented subparts.'" (ellipsis omitted) (quoting ANTONIN

---

[8] Because the Agreement does not define "such," the dictionary definition helps discern the word's commonly understood meaning. *In re Davenport*, 522 S.W.3d 452, 457 (Tex. 2017). Since "a text retains the same meaning today that it had when it was drafted," *Van Dyke v. Navigator Grp.*, 668 S.W.3d 353, 359 (Tex. 2023), we look specifically to dictionaries contemporary to the execution of the Agreement, *cf., e.g.*, *Reyes v. City of Laredo*, 335 S.W.3d 605, 607 (Tex. 2010).

No. 23-50419

Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 156 (2012))). All but one of these subparts makes explicit reference to the permits as issued by *cities*.[9] This is true even in the subsection Prewitt contends proves its case.

Looking at the sentence immediately preceding the language on which Prewitt relies, the Agreement states that in "consideration of and payment [sic] for . . . *such permits*," Charter must pay Prewitt three percent of the gross revenues Charter receives "from the operation of such CATV system" on a quarterly basis, *i.e.*, the royalty payments, "during the life of *each such assigned permit* and amendments thereto, and any holding over thereunder, renewals or extension thereof." The Agreement further states that Charter's "obligation" to pay royalties "shall run with the permits."

Each mention of "permit," when viewing the Agreement in its entirety, refers to permits issued by *cities*. From the outset, the Agreement announces what it is concerned with: the permits Prewitt obtained from the Cities. The Agreement came to fruition because these permits "authorize[d] Prewitt to construct, maintain and operate community antenna systems (CATV systems) in such cities"; Prewitt wanted to "leas[e] such permits"; and Charter wanted to be the lessee so it could construct, maintain, and operate CATV systems in those cities under Prewitt's permits. Prewitt and Charter struck a bargain, which included a purchase option for "such city permits." To purchase these permits, Charter agreed to make quarterly royalty payments to Prewitt "during the life of each such assigned permit," an obligation which was to "run with the permits." The Agreement also specified that the term "the permits" refers to the permits issued to Prewitt

---

[9] The subpart that does not explicitly mention the city-issued permits describes how Charter must give notice if it exercises the option to purchase those permits and states the purchase's effective date.

11

by the Cities. All in all, reading the Agreement's provisions as a whole contextualizes the parties' references to "permit" and evidences their intent to refer to city-issued permits.

2

Prewitt contends that the words "any new permit" do not refer to city-issued permits because the Agreement elsewhere refers explicitly to permits issued by cities. But this argument does not sufficiently consider the Agreement's plain text, which defines the phrase "the permits" as referencing city-issued permits. Prewitt's assertion also does not consider the interpretive weight the Agreement's context provides. *Cf. Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 294 (5th Cir. 2020) (en banc) ("The canon against surplusage yields to context as it expresses courts' *general* reluctance to treat statutory terms as surplusage." (citation modified)). Though various words modify "permit" or "permits" throughout the Agreement, they invariably refer in context to city-issued permits. While differences in language generally lead to differences in meaning under Texas contract law, Prewitt's contention would convert this principle from a tool "applied with judgment and discretion" and "with careful regard to context" into a rigid interpretive mandate. *See Whole Woman's Health v. Jackson*, 642 S.W.3d 569, 582 (Tex. 2022) (internal quotation marks omitted) (quoting SCALIA & GARNER, *supra*, at 176).

Prewitt also argues that because the Agreement defines "the permits" and "the city permits," but not "permit" or "new permit," the phrase "any new permit" cannot refer to city-issued permits. This context-related contention discounts the Agreement's language on the whole. *See supra* Section III.B.1.; *see also, e.g.*, *Morath v. Lampasas Indep. Sch. Dist.*, 686 S.W.3d 725, 737-38 (Tex. 2024). Accepting this argument would require us to read the Agreement's terms "in isolation," which the Supreme Court of Texas

prohibits, since "doing so distorts meaning." *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019); *cf. Utah Junk Co. v. Porter*, 328 U.S. 39, 44 (1946) ("All construction is the ascertainment of meaning. And literalness may strangle meaning.").

## C

It is also paramount under Texas law that we view contracts "as of the time [they] are made and not in the light of subsequent events." *Ervay, Inc. v. Wood*, 373 S.W.2d 380, 384 (Tex. App.—Dallas 1963, writ ref'd n.r.e.). We must ask "what the text reasonably meant to an ordinary speaker of the language who would have understood the original text in its context. Whatever that meaning was then remains the meaning today." *Van Dyke*, 668 S.W.3d at 360; *see* SCALIA & GARNER, *supra*, at 78 ("Although courts routinely apply legal instruments to novel situations over time, their meaning remains fixed.").

The parties agree that when they entered into the Agreement, cities issued the permits for cable providers to operate in public rights-of-way. It would be more than four decades after the parties executed the Agreement that a governmental entity other than cities would issue these permits. *See Tex. Cable & Telecomms. Ass'n v. Hudson*, 265 F. App'x 210, 212–13 (5th Cir. 2008) (unpublished). Though Prewitt urges that the Agreement's language is sufficiently broad to cover city-issued permits and SICFAs, this reading is not reasonable in light of the legal landscape of which the parties were aware at the time the Agreement was executed. *See Jamestown Partners, L.P. v. City of Fort Worth*, 83 S.W.3d 376, 381 (Tex. App.—Fort Worth 2002, pet. denied) ("Courts presume the parties to a contract knew and took into consideration the laws affecting matters about which they contracted, unless the contrary clearly appears in the terms of the contract."). Absent compelling textual evidence that the parties intended for the Agreement to

cover more than city-issued permits, the then-existing legal circumstances indicate the parties' intention to contract only as to city-issued permits. *See Kachina Pipeline Co., Inc. v. Lillis*, 471 S.W.3d 445, 450 (Tex. 2015) ("[E]vidence of circumstances can be used to 'inform the contract text and render it capable of only one meaning.'" (quoting *Americo Life, Inc. v. Myer*, 440 S.W.3d 18, 22 (Tex. 2014))).

\* \* \*

The Agreement's language, in the context of the whole instrument, unambiguously refers to permits issued by cities. Since the Agreement can "be given a certain [and] definite meaning," we construe its language as a matter of law, and our textual inquiry ends. *See Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010) (per curiam). The district court did not err when it concluded "the parties entered into the Agreement[] under the basic presumption that the City Permits would continue to exist," but that does not end our analysis.

## IV

Prewitt next argues that the district court erred in holding that the Savings Clause did not affect the Agreement between the parties, as it requires Charter to continue paying royalties so long as it continues to operate the cable networks in the Cities. We agree.

## A

In relevant part, § 66.004(f) of the Act reads:

Except as provided in this chapter, nothing in this chapter is intended to abrogate, nullify, or adversely affect in any way the contractual rights, duties, and obligations existing and incurred by a cable service provider or a video service provider before the date a franchise expires or the date a provider terminates a franchise under Subsection (b-1) or (b-2), as applicable, and

owed or owing to any private person, firm, partnership, corporation, or other entity including without limitation those obligations measured by and related to the gross revenue hereafter received by the holder of a state-issued certificate of franchise authority for services provided in the geographic area to which such prior franchise or permit applies. All liens, security interests, royalties, and other contracts, rights, and interests in effect on September 1, 2005, or the date a franchise is terminated under Subsection (b-1) or (b-2) shall continue in full force and effect, without the necessity for renewal, extension, or continuance, and shall be paid and performed by the holder of a state-issued certificate of franchise authority, and shall apply as though the revenue generated by the holder of a state-issued certificate of franchise authority continued to be generated pursuant to the permit or franchise issued by the prior local franchising authority or municipality within the geographic area to which the prior permit or franchise applies. It shall be a condition to the issuance and continuance of a state-issued certificate of franchise authority that the private contractual rights and obligations herein described continue to be honored, paid, or performed to the same extent as though the cable service provider continued to operate under its prior franchise or permit, for the duration of such state-issued certificate of franchise authority and any renewals or extensions thereof, and that the applicant so agrees.

TEX. UTIL. CODE § 66.004(f).

As with contract interpretation, "we use the same methods of statutory interpretation used by the Texas Supreme Court" when interpreting Texas law. *Camacho v. Ford Motor Co.*, 993 F.3d 308, 311 (5th Cir. 2021). "[O]ur goal is to ascertain legislative intent," so we begin with the text of the statute. *City of DeSoto v. White*, 288 W.S.3d 389, 394 (Tex. 2009). "If the text is unambiguous, we must take the Legislature at its word." *BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 86 (Tex.

2017) (quoting *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 652 n.4 (Tex. 2006)).

In analyzing a statute's plain text, it is presumed that the Legislature intended the entire statute to have a purpose, *see* TEX. GOV'T CODE § 311.021(2), meaning "each sentence, clause, and word is to be given effect if reasonable and possible." *Tex. Workers' Comp. Ins. Fund v. Del Indus., Inc.*, 35 S.W.3d 591, 593 (Tex. 2000). "[W]e will not give an undefined statutory term a meaning that is out of harmony or inconsistent with other provisions in the statute," however. *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex. 2003). Other considerations include "the context and framework of the *entire* statute," as we must not view the disputed parts of the statute in isolation. *Pub. Util. Comm'n of Tex. v. Luminant Energy Co.*, 691 S.W.3d 448, 460 (Tex. 2024) (emphasis added) (quoting *Cadena Comercial USA Corp. v. Tex. Alcoholic Beverage Comm'n*, 518 S.W.3d 318, 326 (Tex. 2017)).

"Whether statutory language is ambiguous is a matter of law for courts to decide." *Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 405 (Tex. 2016). Only when it is determined that it is ambiguous, meaning "the language of the statute could support more than one reasonable interpretation," *In re Missouri Pac. R. Co.*, 998 S.W.2d 212, 217 (Tex. 1999), may we "resort to rules of construction or extrinsic aids." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (quoting *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007)).

B

Prewitt reads the Savings Clause to mean that as a condition of the issuance and continuance of Charter's SICFA, Charter must continue paying royalties in the same manner as if the city-issued permits remained in effect.

The Savings Clause provides that it is not "intended to abrogate, nullify, or adversely affect" any existing contractual obligations between a cable service provider and a private party, which includes the Agreement. TEX. UTIL. CODE § 66.004(f). It explicitly mentions royalties, stating they "shall continue in full force and effect . . . *as though* the revenue generated by the holder of a [SICFA] continued to be generated" under the city-issued permits "within the geographic area" to which it had applied. *Id.* (emphasis added). And an express "condition to the issuance" of a SICFA is that the pre-existing contractual obligations "herein described continue to be honored, paid, or performed to the same extent *as though* the cable service provider continued to operate under its prior franchise or permit." *Id.* (emphasis added). The obligations include those "measured by and related to the gross revenue hereafter received by the holder of a [SICFA] for services provided in the geographic area to which such prior franchise or permit applies." *Id.*

Here, Prewitt assigned the city-issued permits for the Cities to Charter in exchange for a royalty of 3% of gross revenues earned on the permits. When Charter later obtained the SICFAs, under the Savings Clause, it agreed to honor all pre-existing royalties "*as though* the revenue generated" in the Cities "continued to be generated" under the prior city-issued permits, and "*as though* the cable service provider continued to operate under" the city-issued permits." *Id.* (emphases added). Because Charter's royalty-payment obligation is "measured by and related to the gross revenue hereafter received by the holder of a [SICFA] for services provided in the geographic area to which such prior franchise or permit applie[d]," *id.*, Prewitt is entitled to the same 3% of gross revenues that Charter previously earned on the city-issued permits.

The context of the regulatory scheme supports this reading of the statute. The basic premise of the Act is for the SICFAs to take the place of

the city-issued permits that are "terminated" when the SICFAs are issued. *Id.* § 66.004(b), (b-1), (b-2). We read the object of § 66.004(f) as securing Prewitt's right under all previous agreements to 3% of the revenues Charter earns under its SICFAs despite termination of the city-issued permits. Otherwise, the regulatory scheme would "abrogate, nullify, or adversely affect" Prewitt's pre-existing rights under the Agreement. *Id.*

The Savings Clause saves Charter's royalty-payment obligation to Prewitt.

C

Charter argues that its "payment obligation remained tethered to the life of the city permits." While it is true that, under the Agreement, Charter's royalty-payment obligation "r[a]n with the [city-issued] permits," under the Savings Clause, the obligation now runs with the SICFAs.

Charter also argues that the district court properly considered the Public Utility Commission's interpretation of the Savings Clause, and that as the entity charged with issuing SICFAs, its interpretation is entitled to "respect." We disagree. Extrinsic evidence should only be considered once the relevant provision is found to be ambiguous. *Entergy Gulf States,* 282 S.W.3d at 437. Because the language of the Savings Clause is unambiguous, the Public Utility Commission's interpretation is irrelevant to our analysis.

Finally, Charter attempts to pursue additional arguments on appeal, contending that our interpretation of the Savings Clause "would run afoul of federal (and state) laws" as well as the Texas and United States Constitutions. The district court passed on these issues, including whether "(1) the Agreements are unenforceable because they are indefinite in duration; (2) the Act's Saving Clause violates and is preempted by the Federal Cable Act; (3) the Saving Clause violates the First Amendment and the Equal Protection Clause; and (4) the Saving Clause violates the Contracts

No. 23-50419

Clause." *Charter*, 2023 WL 3859027, at *3. Because "we are a court of review, not of first view," it is for the district court to rule on these arguments in the first instance. *Rutilla v. Dep't of Transp.*, 12 F.4th 509, 511 n.3 (5th Cir. 2021).

V

We REVERSE the decision of the district court and REMAND for further proceedings consistent with this opinion.

No. 23-50419

Priscilla Richman, *Circuit Judge*, concurring:

I agree with the majority opinion that the Savings Clause preserves Charter's royalty-payment obligation to Prewitt. However, to the extent the majority opinion concludes, explicitly or implicitly, that Charter's obligation to pay royalties under the plain language of the Agreement ceased, I disagree. The plain and unambiguous language of the Agreement provides that Charter's obligation to pay quarterly royalties to Prewitt remained after Charter acquired state-issued SICFAs and the city-issued permits covering Waco, Temple, and McGregor were supplanted.

Under Section 2(b) of the Agreement, the duration of the royalty payment obligation is as follows:

> [Charter] or its said assigns shall pay to Prewitt, his heirs, successors, personal representatives and assigns, during the life of each such assigned permit and amendments thereto, and any holding over thereunder, renewals or extensions thereof, a sum equal to three per cent (3%) of the gross revenues . . . For the purposes of this agreement, in the event any new permit is granted to [Charter] or any assignee of any such permits, or any company directly or indirectly controlled by any of same before, at, or after the expiration of the existing permits, such new permit shall be conclusively treated and considered as a renewal of the existing permit, even if the terms thereof are new and different, and such three per cent (3%) of the gross revenues thereof shall be so paid to Prewitt, his heirs, successors, personal representatives and assigns.

The crux of the parties' dispute is whether a state-issued SICFA is to be considered as "any new permit," which "shall be conclusively treated and considered as a renewal of the existing permit," leaving Charter's royalty obligation in place.

No. 23-50419

Courts "must enforce [] contracts as written" and "cannot vary [the] terms."[1] The "goal of contract interpretation is to ascertain the parties' true intent as expressed by the plain language they used."[2] "'Plain meaning' is a watchword for contract interpretation because word choice evinces intent."[3] Accordingly, applying Texas law, we "assign terms their ordinary and generally accepted meaning" and "refuse to insert language the parties did not use."[4]

The majority opinion reasons that "reading the Agreement's provisions as a whole contextualizes the parties' references to 'permit' and evidences their intent to refer to city-issued permits."[5] Yet, "[a] contract's plain language controls,"[6] and the parties agree that the Agreement is unambiguous.[7] We are "not at liberty to revise an agreement while professing to construe it."[8]

The Agreement references "any new permit," not "any new city-issued permit," or "any new permit issued by a city," or "any new permit granted by either Waco, Temple, or McGregor." Such qualifying words are

_____

[1] *Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex. 1965).

[2] *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017); *see also Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006) ("[T]he parties' intent is governed by what they said, not by what they intended to say but did not.").

[3] *Gream Am. Ins. Co.*, 512 S.W.3d at 890.

[4] *Id.*

[5] *Ante* at 12.

[6] *Primo*, 512 S.W.3d at 893.

[7] *Ante* at 9 n.7.

[8] *Gen. Am. Indem. Co. v. Pepper*, 339 S.W.2d 660, 661 (1960).

not in the agreement.  We should "enforce the contract[] as written,"[9] and assign "any new permit" its plain and ordinary meaning.

"Any" means "'one, some, or all,' an indefinite number, without limitation."[10]  The Merriam-Webster dictionary provides that "new" means "having recently come into existence," or "being other than the former or old," and "permit" means "a written warrant or license granted by one having authority."[11]  The SICFAs were "new," as they replaced Charter's previous city-issued permits, and did not exist prior to the Texas Cable Act. The SICFAs were "permits," as they granted Charter the right to use and occupy the public rights-of-way in delivering cable service.[12]  So, if "any new permit" is given its plain and ordinary meaning, the state-issued SICFA's were "new permits," that should be "treated and considered as a renewal of the existing permit[s]."  Charter should remain obligated to pay royalties so long as Charter continues to provide cable service under a SICFA in Waco, Temple, and McGregor.

The Agreement's express terms also contemplate a wholly new and different iteration of a permit.  The Agreement states that "even if the terms [of any new permit] are new and different," "such three per cent (3%) of the gross revenues thereof shall be so paid to Prewitt, his heirs, successors, personal representatives and assigns."  Even though the state-issued SICFAs

---

[9] *Royal Indem. Co. v. Marshall,* 388 S.W.2d 176, 181 (Tex. 1965).

[10] *Interstate 35/Chisam Rd., L.P. v. Moayedi*, 377 S.W.3d 791, 800 (Tex. App.—Dallas 2012), *judgment aff'd*, 438 S.W.3d 1 (Tex. 2014).

[11]     *New,*     MERRIAM-WEBSTER,     https://www.merriam-webster.com/dictionary/new (last visited Aug. 19, 2025); *Permit*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/permit (last visited Aug. 19, 2025).

[12] *See* Tex. Util. Code § 66.003(c).

include terms that are "new and different" from the city-issued permits, under the plain language of the Agreement, the royalty obligation remains.

## II

The district court and the majority opinion rely on Section 1(d) of the Agreement, which states:

> The permits from the cities (sometimes referred to herein as 'the permits' or 'the city permits'), shall be and remain the property of Prewitt . . . .

This language does not define "permit" or "new permit." The phrase "any new permit" in Section 2(b) is not bound by the definition of "[t]he permits from the cities" in Section 1(d).

Section 1(d) is limited in scope and inapplicable to the present controversy. The language following the definition states that these permits "shall be and remain the property of Prewitt" during the lease and until Charter's predecessor exercised its option to purchase those permits. Section 1(d) thus defines and refers to the original city-issued permits that were only leased to Charter's predecessor—those issued by Waco, Temple, or McGregor—and only those permits. Its purpose was to clarify that the original city permits remained Mr. Prewitt's property during the original lease term, and it no longer had any continued effect after original lease term's expiration, which was decades ago. Section 1(d) does not, as the majority opinion states, define "any new permit" in Section 2(b).[13]

---

[13] *Ante* at 12 ("[T]he Agreement's plain text [] defines the phrase 'the permits' as referencing city-issued permits.").

No. 23-50419

## III

The majority opinion reasons that the Agreements language is not "sufficiently broad to cover city-issued permits and SICFAs . . . in light of the legal landscape of which the parties were aware at the time the Agreement was executed."[14]  Because it would be "more than four decades after the parties executed the Agreement that a governmental entity other than cities would issue these permits . . . the then-existing legal-circumstances indicate the parties' intention to contract only as to city-issued permits."[15]

While "[s]urrounding facts and circumstances can inform the meaning of language" "they cannot be employed to 'make the language say what it unambiguously does not say' or 'to show that the parties probably meant, or could have meant, something other than what their agreement stated.'"[16]  "When interpreting a written contract, the prime directive is to ascertain the parties' intent as expressed in the instrument" and "objective, not subjective, intent controls."[17]

The fact that governmental entities other than cities would not issue permits to cable providers until four decades later does not mean that the phrase "any new permit" could never include state-issued permits, such as SICFAs.  We should look to the objective meaning of the words used, and refuse to "divine subjective intent and interpolate constraints not found in the contract's unambiguous language."[18]  The Agreement states "any new

---

[14] *Ante* at 14.

[15] *Ante* at 13-14.

[16] *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 757 (Tex. 2018).

[17] *Id.* (citations omitted).

[18] *Id.* at 758.

No. 23-50419

permit," not "any new *city* permit." The SICFAs are "new permits," and Charter's royalty obligation remained.

\* \* \*

I concur in the judgment reversing the district court's judgment and remanding to that court.